COURT OF APPEALS OF VIRGINIA

Present:   Judges Petty, Beales and Alston
Argued at Chesapeake, Virginia


VAN ANDRE BEASLEY

                                                          OPINION BY
v.        Record No. 1534-11-1                    JUDGE RANDOLPH A. BEALES
                                                          JULY 17, 2012

COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF THE CITY OF NORFOLK
Mary Jane Hall, Judge

J. Barry McCracken, Assistant Public Defender (Office of the Public
Defender, on brief), for appellant.

Steven A. Witmer, Senior Assistant Attorney General (Kenneth T.
Cuccinelli, II, Attorney General, on brief), for appellee.


Van Andre Beasley (appellant) was convicted in the trial court of possession of cocaine,

in violation of Code § 18.2-250, and possession of heroin with intent to distribute (third or

subsequent offense), in violation of Code § 18.2-248.  Appellant argues on appeal that the trial

court erred when it denied his motion to suppress these illegal drugs from the evidence admitted

at trial.  We disagree with appellant's argument, and, for the following reasons, we affirm the

convictions.

## I. BACKGROUND[1]

During the overnight hours of June 19, 2010, Sergeant Lee Tennis of the Norfolk Police Department conducted a routine patrol of that city's Lexington Park area – a high-crime area noted for drug activity, gun violence, and homicides. Sergeant Tennis was very familiar with the Lexington Park area, and he had made narcotics arrests, recovered weapons, and responded to calls of shots being fired there.

At about 3:30 a.m., while driving his patrol car near the 900 block of Goff Street, Sergeant Tennis noticed a blue minivan that was legally parked on the street in front of the rental office of the Lexington Square apartment complex. Sergeant Tennis observed that there was a person in the driver's seat (Lawson) and a person in the back seat on the passenger's side (Bowman). In addition, Sergeant Tennis also noticed that a person wearing a long-sleeve white shirt and jeans was walking toward the minivan. At the time Sergeant Tennis noticed him, this person was "[i]n the parking lot towards the rental office, right around the mailbox." According to Sergeant Tennis, the area surrounding the apartment complex was clearly marked with no trespassing signs.

Sergeant Tennis continued on his patrol of the Lexington Park area – returning within five minutes to find that the minivan was still parked in the same place on Goff Street. From his vantage point in his patrol car, Sergeant Tennis observed Lawson, the driver of the minivan, appear "to bend down towards the center console of the van or where the center console would be." Sergeant Tennis testified that Lawson's act of bending down in this way "kind of alerted

---

[1] "On appeal of the denial of a motion to suppress, we consider the evidence adduced at both the suppression hearing and the trial, DePriest v. Commonwealth, 4 Va. App. 577, 583, 359 S.E.2d 540, 542-43 (1987), and we view it in the light most favorable to the Commonwealth, as the party that prevailed below. Commonwealth v. Grimstead, 12 Va. App. 1066, 1067, 407 S.E.2d 47, 48 (1991)." Blevins v. Commonwealth, 40 Va. App. 412, 420, 579 S.E.2d 658, 662 (2003), aff'd on other grounds, 267 Va. 291, 590 S.E.2d 365 (2004).

me a little bit" given that the minivan was parked in a high-crime area. Sergeant Tennis then "illuminated the [minivan's] interior" with his patrol car's "right side alley light" and noticed that Lawson "was still bent down towards the center console."

Sergeant Tennis's suspicions were also raised because he could see that there were now *three* people inside the minivan – Lawson in the driver's seat, Bowman in the back seat on the passenger's side of the vehicle, and, in addition, appellant in the front passenger's seat. Appellant was wearing a long-sleeve white shirt and jeans – the same type of clothes as the clothing worn by the person who had been walking towards the minivan a few moments earlier.

Sergeant Tennis exited his patrol car and approached the driver's side of the minivan.[2] Illuminating the interior of the minivan somewhat with his hand-held flashlight, Sergeant Tennis observed appellant "reaching underneath his shirt." Appellant also reached down with his right hand "towards the side of his seat, towards the back of the minivan." Sergeant Tennis could not see what was in appellant's right hand from his vantage point.

"At that exact moment," Sergeant Tennis testified, "I noticed that Mr. Bowman, who was seated right behind [appellant], began to reach towards the seat where" appellant was sitting. Bowman "was also reaching with his right hand towards [appellant's] right hand." Sergeant Tennis testified that these "furtive movements" made him "very uneasy and very suspicious" because appellant and Bowman "were moving their hands all around" – raising the suspicion that "they had a gun." In his "extensive experience," Sergeant Tennis explained to the trial court,

_____

[2] Lawson, the driver of the minivan, briefly exited the minivan before Sergeant Tennis directed him back inside the vehicle. We offer no opinion whether *Lawson* was seized at that point, and appellant never argued below that Lawson's submission to this order somehow resulted in *all* the occupants of the minivan being seized. See Rule 5A:18. This was not a traffic stop, as the minivan was legally parked at the time of the encounter. Furthermore, at the point when Lawson re-entered the minivan, Sergeant Tennis had not yet encountered appellant, who was still inside the minivan.

- 3 -

when people move their hands in this type of furtive manner, "they have either had narcotics or a weapon in the vehicle. Mainly a weapon."

Sergeant Tennis told the minivan's occupants, "Let me see your hands. Put your hands in your laps." Appellant initially complied with this instruction – as did the other two occupants. However, while Sergeant Tennis was waiting to determine if any of the minivan's occupants had outstanding arrest warrants,[3] the sergeant "noticed, once again, [appellant] take his hands and mov[e] [them] around." Sergeant Tennis testified that appellant "once again tried to drop his hand down towards the right side of the seat," like "he was going to reach towards the back once again."

Sergeant Tennis repeated his instruction to appellant "to put his hands back on his lap" where the sergeant could see them. However, Sergeant Tennis then "noticed that the passenger side window was down" and that appellant "had his hand rested slightly outside of that window." Sergeant Tennis directed appellant, for a third time, to "put his hands on his lap and keep them that way." At that point, according to Sergeant Tennis, appellant "complied." Sergeant Tennis testified that appellant "didn't move his hands anymore."

When Officer Simpson and Officer Folston arrived on the scene, Sergeant Tennis decided to conduct a pat down of the minivan's occupants to determine if they were carrying any weapons. The occupants were ordered out of the minivan so that the limited pat-down search for

---

[3] All three of the minivan's occupants provided identification or identifying information upon Sergeant Tennis's request. However, case law makes clear that the Fourth Amendment "is not implicated when a person voluntarily responds to a police request to produce identification" provided that "the police do not convey, by word or deed," that compliance is mandatory. Montague v. Commonwealth, 278 Va. 532, 538, 684 S.E.2d 583, 587 (2009). The United States Supreme Court has explained, "While most citizens will respond to a police request, the fact that people do so, and do so without being told they are free not to respond, hardly eliminates the consensual nature of the response." Immigration & Naturalization Service v. Delgado, 466 U.S. 210, 216 (1984).

weapons could be conducted. However, appellant did not comply with Officer Folston's directions for conducting the pat down. According to Sergeant Tennis's testimony, appellant was not spreading his feet apart and was keeping his hands tense so that they could not be interlocked, contrary to Officer Folston's instructions to him.

Sergeant Tennis directed his flashlight at appellant's feet and noticed that there was a small, black, "change-type bag" mostly underneath appellant's right foot. Sergeant Tennis told appellant to lift his foot, but appellant refused. Sergeant Tennis tried "to slightly push his foot out," but appellant "had his foot firmly planted on the ground." When appellant ignored another command to move his foot, Sergeant Tennis then "used a lot more force" and "pushed his foot out, spreading his feet." Sergeant Tennis then recovered the small bag, which contained heroin and cocaine.

Appellant moved to suppress the illegal drugs from the trial evidence – contending that he was seized without reasonable, articulable suspicion of criminal activity (and, therefore, that the illegal drugs must be suppressed as "fruit of the poisonous tree"). Sergeant Tennis was the only witness at the suppression hearing. At the conclusion of the suppression hearing, the trial court denied appellant's motion to suppress based on all of the circumstances presented in Sergeant Tennis's testimony – including the "furtive movement" that the sergeant observed, which the trial court found significant based on Sergeant Tennis's "lengthy experience."

II. ANALYSIS

Standard of Review and General Fourth Amendment Principles

This Court reviews appellant's challenge to the denial of his motion to suppress under settled principles. The Virginia Supreme Court has explained:

> When reviewing a denial of a motion to suppress evidence, an appellate court considers the evidence in the light most favorable to the Commonwealth and will accord the Commonwealth the benefit of all reasonable inferences fairly deducible from that

evidence. Sidney v. Commonwealth, 280 Va. 517, 520, 702 S.E.2d 124, 126 (2010). The defendant has the burden of showing that even when the evidence is reviewed in that light, denying the motion to suppress was reversible error. Id. at 522, 702 S.E.2d at 127. We review *de novo* the trial court's application of the law to the particular facts of the case. Glenn v. Commonwealth, 275 Va. 123, 130, 654 S.E.2d 910, 913, (2008).

Branham v. Commonwealth, 283 Va. 273, 279, 720 S.E.2d 74, 77 (2012). On appeal from the denial of a suppression motion, an appellate court should "'give due weight to inferences drawn from those facts by resident judges and local law enforcement officers.'" Reittinger v. Commonwealth, 260 Va. 232, 236, 532 S.E.2d 25, 27 (2000) (quoting Ornelas v. United States, 517 U.S. 690, 699 (1996)).

"The Fourth Amendment guarantees, in relevant part, '[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures.'" Brooks v. Commonwealth, 282 Va. 90, 95, 712 S.E.2d 464, 466 (2011) (quoting U.S. Const. amend. IV).

However, "[n]ot every encounter that the police have with a member of the public is a seizure." Washington v. Commonwealth, 29 Va. App. 5, 10, 509 S.E.2d 512, 514 (1999). A consensual encounter between the police and an individual "will not trigger Fourth Amendment scrutiny unless it loses its consensual nature" and renders the person seized under the Fourth Amendment. Florida v. Bostick, 501 U.S. 429, 434 (1991). Moreover, case law makes clear that a person is seized for Fourth Amendment purposes only when the person "is either physically restrained or has submitted to a show of authority." McGee v. Commonwealth, 25 Va. App. 193, 199, 487 S.E.2d 259, 262 (1997) (en banc) (citing California v. Hodari D., 499 U.S. 621, 625 (1991)).

<u>*Moss v. Commonwealth*</u> is Not Controlling Here

Appellant argues that he was seized under the Fourth Amendment before the encounter with Sergeant Tennis actually occurred – i.e., when Sergeant Tennis illuminated the interior of the minivan with the "right side alley light" of his patrol car prior to approaching the minivan on foot. In support of this argument, appellant relies on this Court's opinion in <u>Moss v. Commonwealth</u>, 7 Va. App. 305, 373 S.E.2d 170 (1988). However, <u>Moss</u> is not controlling here.

In <u>Moss</u>, the flashlight that the police officer pointed *directly* at Moss was, according to the officer, "bright and ha[d] an effect of blinding the other parties, which stuns them." <u>Id.</u> at 307, 373 S.E.2d at 172. This Court explained that "[t]he blinding and stunning effect of the flashlight in the hands of a uniformed officer who is asking questions amounts to a 'show of official authority' such that a reasonable person would conclude he was not free to leave." <u>Id.</u> at 307-08, 373 S.E.2d at 172. Thus, this Court held that the manner in which the police officer "suddenly confronted" Moss with this flashlight "amounted to a 'seizure' of Moss's person." <u>Id.</u> at 307, 373 S.E.2d at 172.

This Court's decision in <u>Moss</u> – which was based on the specific circumstances of that case – certainly is not controlling on the very different circumstances that are presented in this case. Unlike in <u>Moss</u>, the record here does not indicate how bright the "right side alley light" of the patrol car was or indicate what its effect (if any) on the occupants of the minivan was. "Viewing the evidence in the light most favorable to the Commonwealth, as we must since it was the prevailing party in the trial court," <u>Riner v. Commonwealth</u>, 268 Va. 296, 330, 601 S.E.2d 555, 574 (2004), nothing in this record supports the conclusion that the "right side alley light" of Sergeant Tennis's patrol car was so intensely bright as to blind and stun the occupants of the minivan. Accordingly, the circumstances in <u>Moss</u> are readily distinguishable from the circumstances of this case.

<u>No Seizure Occurs Until Appellant Submits to the Officer's Show of Authority</u>

Instead, the Virginia Supreme Court's decision in <u>Cochran v. Commonwealth</u>, 258 Va. 604, 521 S.E.2d 287 (1999), is controlling for determining whether and when appellant was seized under the Fourth Amendment in this case. In <u>Cochran</u>, the Court discussed the test for determining whether a seizure has occurred that the United States Supreme Court formulated in <u>United States v. Mendenhall</u>, 446 U.S. 544 (1980), and subsequently interpreted in <u>Hodari D</u>. According to the <u>Mendenhall</u> test, "a person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.'" <u>Id.</u> at 554. However, as the Virginia Supreme Court held in <u>Cochran</u>, the <u>Mendenhall</u> test "is not applicable *until the person submits* to the officer's show of authority." <u>Cochran</u>, 258 Va. at 608, 521 S.E.2d at 289 (emphasis added).

This principle stated in <u>Cochran</u> reflects the United States Supreme Court's holding in <u>Hodari D.</u> that a seizure of a person requires either physical force by the police officer or, "where that is absent, *submission* to the assertion of authority." <u>Hodari D.</u>, 499 U.S. at 626 (emphasis in original); <u>see Woodson v. Commonwealth</u>, 245 Va. 401, 405, 429 S.E.2d 27, 29 (1993) ("Thus, as in <u>Hodari D.</u>, because Woodson did not submit to [Detective] Carter's command, we must focus upon what Woodson did, not what a reasonable person would have assumed under the circumstances.").

The Virginia Supreme Court's clear holding in <u>Cochran</u> that a person must first submit to the police officer's show of authority before being seized for Fourth Amendment purposes is well established in Virginia's case law.[4] Consistent with <u>Cochran</u> and other binding case law,

---

[4] In <u>McCain v. Commonwealth</u>, 261 Va. 483, 491, 545 S.E.2d 541, 546 (2001), the Virginia Supreme Court reiterated that "[a] seizure does not occur in the absence of physical force used by a law enforcement officer or a defendant's submission to an officer's assertion of

this Court must consider what appellant "actually did in response to the police officer's show of authority" and when appellant actually *submitted* to Sergeant Tennis's show of authority in order to determine when appellant was seized for Fourth Amendment purposes. Woodson, 245 Va. at 405, 429 S.E.2d at 29. This Court's opinion in Jones v. Commonwealth, 52 Va. App. 548, 665 S.E.2d 261 (2008), – which, like this case, dealt with instructions by the police for an individual to keep his hands where they could be seen – is highly instructive on this issue.

In Jones, two police officers observed Jones sitting alone in a vehicle parked in the parking lot of a hotel known for drug transactions. The officers approached the vehicle and initiated a consensual encounter with Jones. During this encounter, the officers observed Jones reaching toward the floorboard of the vehicle. Concerned that a weapon was within Jones's reach, one of the officers instructed Jones to keep his hands on the steering wheel. Although Jones *initially* complied with this instruction, Jones then began reaching toward the floorboard again, prompting the officer to repeat the instruction to keep his hands on the steering wheel. When Jones reached for the floorboard a third time, the officer drew his firearm and ordered Jones to exit the vehicle. Id. at 551-54, 665 S.E.2d at 263-64.

On appeal, this Court held that neither Jones's initial compliance with the officer's instruction to keep his hands on the steering wheel nor the officer's repeating of this instruction multiple times transformed the consensual encounter into a seizure. This Court explained:

---

authority." Similarly, this Court has explained, "[T]here is a condition precedent to a seizure: The individual must submit to the officer's force or authority." Jones v. Commonwealth, 52 Va. App. 548, 557, 665 S.E.2d 261, 265 (2008); see also Brown v. City of Danville, 44 Va. App. 586, 604, 606 S.E.2d 523, 532 (2004) ("Accordingly, once Brown agreed to go over to the police car, thereby submitting to Officer Reid's show of authority, a seizure had occurred."); Washington, 29 Va. App. at 10-11, 509 S.E.2d at 514 ("A seizure occurs when by physical force or show of authority and submission thereto, an individual's freedom of movement is restrained and the person is not free to leave."); McGee, 25 Va. App. at 199, 487 S.E.2d at 262 (stating that a person is not seized until that person "is either physically restrained or has submitted to a show of authority").

- 9 -

As noted, after the officers approached Jones and [Officer] Tovar initiated conversation, Jones reached down to the floorboard and Tovar asked him to put his hands on the wheel of the vehicle. Then, on three occasions, Jones refused to comply with that command and reached for the floorboard. Thus, he did not submit to Tovar's assertion of authority.

Id. at 557, 665 S.E.2d at 265-66; see also Woodson, 245 Va. at 405, 429 S.E.2d at 29 (explaining that "it is apparent that Woodson had not been seized when [Detective] Carter ordered him to place his hands where Carter could see them because *Woodson did not submit* to Carter's authority" (emphasis added)). Therefore, this Court held in Jones that the seizure occurred when the officer drew his weapon and ordered Jones to exit the vehicle — but *not* before then. Jones, 52 Va. App. at 557, 665 S.E.2d at 266.

Here, like in Jones, Sergeant Tennis instructed appellant (as well as Lawson and Bowman, the minivan's other occupants) to keep his hands where they could be seen, i.e., on his lap. As in Jones, neither this instruction nor appellant's initial but very temporary compliance with this instruction was enough, by itself, to transform a consensual encounter into a seizure. After this very brief, initial moment of compliance, appellant (like the defendant in Jones) then felt free to ignore Sergeant Tennis's instructions and continued moving his right hand in a furtive manner. Therefore, appellant was not seized for Fourth Amendment purposes simply because Sergeant Tennis issued a second and third command that appellant keep his hands on his lap where they could be seen. Up to that point, appellant had not yet actually submitted to Sergeant Tennis's show of authority within the meaning of this Court's decision in Jones.

Appellant only *actually submitted* to Sergeant Tennis's show of authority when *appellant* stopped moving his hands furtively following the sergeant's third instruction to keep his hands on his lap where they could be seen. Significantly, according to Sergeant Tennis, appellant "didn't move his hands anymore." By placing (and keeping) his hands where they could be seen,

appellant thereby submitted to Sergeant Tennis's show of authority – and, therefore, became seized for Fourth Amendment purposes at that point.

Accordingly, based on the specific facts and circumstances of this case, we hold that appellant was seized under the Fourth Amendment when he finally actually submitted to Sergeant Tennis's instructions to keep his hands on his lap where they could be seen once appellant did not "move his hands anymore." Furthermore, by the time appellant was seized for Fourth Amendment purposes, enough facts and circumstances had sufficiently accumulated so that reasonable, articulable suspicion of possible criminal activity existed to detain appellant.

Reasonable Articulable Suspicion

Under Terry v. Ohio, 392 U.S. 1 (1968), and its progeny, a police officer "may constitutionally conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." Bass v. Commonwealth, 259 Va. 470, 474-75, 525 S.E.2d 921, 923 (2000) (citing Terry, 392 U.S. at 30).

> A "reasonable suspicion" requires only "some minimal level of objective justification" for making such a stop. I.N.S. v. Delgado, 466 U.S. 210, 217 (1984). Whether an officer has a reasonable suspicion to justify such a detention is "based on an assessment of the totality of the circumstances." Harris v. Commonwealth, 276 Va. 689, 695, 668 S.E.2d 141, 145 (2008). That assessment "allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" United States v. Arvizu, 534 U.S. 266, 273 (2002) (quoting United States v. Cortez, 449 U.S. 411, 418 (1981)).

Branham, 283 Va. at 280, 720 S.E.2d at 78.

Here, as discussed *supra*, appellant was seized under the Fourth Amendment when he actually submitted to Sergeant Tennis's third instruction to keep his hands on his lap where they could be seen. (Until that point, appellant's interaction with Sergeant Tennis had actually been consensual.) A number of factors – within the sergeant's knowledge by the time appellant was

actually seized – provided the sergeant with the required reasonable, articulable suspicion to conduct an investigatory stop at that time.

First, the encounter occurred during the middle of the night in an area (Lexington Park) that is known for narcotics transactions and gun crimes, according to Sergeant Tennis. Second, the area surrounding the Lexington Square apartment complex in Lexington Park is marked with no trespassing signs – and Sergeant Tennis observed that a man wearing the same type of clothing that appellant was wearing (a long-sleeve white shirt and jeans) had been walking in the parking lot of the apartment complex, heading in the direction of the minivan, mere moments before the encounter, which, as noted, occurred around 3:30 a.m. Third, appellant – who appeared quite likely to be the same man who had been observed by Sergeant Tennis walking toward the minivan – was sitting in the front passenger's seat of the minivan that was parked on Goff Street when Sergeant Tennis returned to the area.[5] Fourth, Lawson, the driver of the minivan, reached toward the center console when the patrol car approached the minivan – a movement that concerned the experienced Sergeant Tennis. Fifth, when Sergeant Tennis approached the minivan on foot, he could see appellant reach his hand underneath his shirt – a furtive gesture that also concerned Sergeant Tennis. Sixth, Sergeant Tennis then observed

---

[5] Sergeant Tennis testified that he was especially familiar with the Lexington Park area because he also provided security services for the Lexington Square apartment complex during his off-duty hours. Responding to the trial court's own questions during the suppression hearing, Sergeant Tennis confirmed to the trial court that the person he saw walking in the Lexington Square parking lot at that very late hour "would have been trespassing" on the apartment complex's property unless he lived there (or otherwise was lawfully on that property). Sergeant Tennis testified that he did not know whether or not this person lived at the apartment complex, adding "[t]hat's kind of what my investigation was" at that point. (Sergeant Tennis also testified that trespassing was not his "main concern" after he observed all of the furtive movements that appellant (and the other occupants of the vehicle) made moments later, but the suspicion of trespassing was still a factor within the sergeant's consideration as the situation here was evolving.) The fact that Sergeant Tennis noticed that a person who was wearing the same clothing as the individual who was possibly trespassing was then sitting in the minivan with its two occupants further raised the sergeant's suspicions, given the very late hour of 3:30 a.m. and the sergeant's familiarity with the area as a high-crime area noted for drug transactions.

appellant and Bowman (the man in the rear passenger's seat) moving their right hands in a furtive manner toward each other. Seventh, Sergeant Tennis testified, without objection, that, based on his extensive experience, people who move their hands in such a furtive manner are likely attempting to hide illegal drugs or weapons from the police. Eighth, appellant resumed moving his right hand in a furtive manner after Sergeant Tennis had instructed the minivan's occupants to place their hands on their laps. Ninth, appellant continued moving his right hand in a furtive manner despite yet another instruction from Sergeant Tennis to stop this behavior. Tenth, Sergeant Tennis then observed that appellant's right hand was sitting outside of the front passenger's side window – suggesting perhaps that appellant was attempting to discard an object out the window. These accumulating factors, in their totality, provided a reasonable, articulable suspicion that criminal activity was afoot involving appellant.

On brief, Beasley refers to certain appellate opinions where denials of motions to suppress in the trial courts were reversed on appeal. However, what those cases have in common is that they involve one or some, *but not all*, of the <u>many</u> circumstances supporting reasonable, articulable suspicion that are present here. Accordingly, those cases do not control the analysis here.

For example, unlike in <u>Riley v. Commonwealth</u>, 13 Va. App. 494, 412 S.E.2d 724 (1992), <u>Smith v. Commonwealth</u>, 12 Va. App. 1100, 407 S.E.2d 49 (1991), and <u>Goodwin v. Commonwealth</u>, 11 Va. App. 363, 398 S.E.2d 690 (1990), the facts in this case point to far more than a quick, furtive gesture in the presence of the police officer that gave the officer no more than a hunch of criminal activity. Here, unlike in those cases, Sergeant Tennis observed *many* furtive gestures – including several by appellant himself even after the sergeant instructed him to keep his hands on his lap where they could be seen. Furthermore, based on his extensive experience, Sergeant Tennis also explained the significance of those furtive gestures in the trial

court as suggestive of possession of illegal drugs, a concealed firearm, or both. See Bandy v. Commonwealth, 52 Va. App. 510, 518, 664 S.E.2d 519, 523 (2008) ("'Courts have often recognized that 'the connection between illegal drug operations and guns is a tight one.'" (quoting Jones v. Commonwealth, 272 Va. 692, 701 n.3, 636 S.E.2d 403, 407 n.3 (2006))).

Appellant also relies on Ewell v. Commonwealth, 254 Va. 214, 491 S.E.2d 721 (1997), where the police lacked reasonable, articulable suspicion that the defendant was trespassing. However, the possibility that appellant had been trespassing on the grounds of the Lexington Square apartment complex, while certainly a factor among the totality of the circumstances present here, was not Sergeant Tennis's "main concern," according to the sergeant's testimony in the trial court. Instead, Sergeant Tennis testified that he was mainly concerned by the suspicious and furtive hand movements made by appellant and the other occupants of the minivan – contrasting this case with Ewell, where the Virginia Supreme Court specifically held that "nothing about Ewell's conduct was suspicious." Id. at 217, 491 S.E.2d at 723.

Appellant's further reliance on Asble v. Commonwealth, 50 Va. App. 643, 653 S.E.2d 285 (2007), is also misplaced. In that case, Asble's vehicle was simply sitting on the shoulder of an interstate highway's entrance ramp. Unlike the situation here, none of Asble's actions gave rise to a reasonable suspicion of criminal activity, and "[t]he location was not a high crime area or an area known for illegal conduct." Id. at 649, 653 S.E.2d at 288. "[W]hile a suspect's presence in a high crime area, standing alone, is not enough to support a reasonable particularized suspicion, it is a relevant contextual consideration in a Terry analysis." Whittaker v. Commonwealth, 279 Va. 268, 276, 687 S.E.2d 733, 737 (2010); see Illinois v. Wardlow, 528 U.S. 119, 124 (2000) ("[O]fficers are not required to ignore the relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation.").

Here, the accumulation of many circumstances that are present in the record certainly gave Sergeant Tennis a reasonable, articulable suspicion that appellant was involved in potential criminal activity, such as a drug transaction, the possession of a concealed weapon, or both. Accordingly, the detention of appellant was permissible under the Fourth Amendment.[6]

<u>Seizure of the Small Bag Containing the Illegal Drugs</u>

During oral argument in this Court, appellant's counsel acknowledged that appellant's motion to suppress the illegal drugs in the trial court was based *entirely* on his assertion that the investigatory detention of appellant violated the Fourth Amendment – and, therefore, was also based on his argument that any evidence obtained from the investigatory stop was required to be suppressed as "fruit of the poisonous tree."[7] Accordingly, we do not address any other issues potentially related to the seizure of the small bag containing the illegal drugs because consideration of such issues is barred under Rule 5A:18 due to his failure to raise them in the trial court, because appellant has not requested that this Court invoke any exception to Rule 5A:18, and because this Court will not invoke an exception to Rule 5A:18 *sua sponte*. See Williams v. Commonwealth, 57 Va. App. 341, 347, 702 S.E.2d 260, 263 (2010).

---

[6] Although appellant on appeal has not specifically challenged the legality of the attempted pat-down search for weapons, we note that a reasonable suspicion that appellant possessed a concealed weapon "*ipso facto* rendered [appellant] potentially armed and dangerous." Jones, 52 Va. App. at 560-61, 665 S.E.2d at 267; see Andrews v. Commonwealth, 37 Va. App. 479, 492, 559 S.E.2d 401, 408 (2002) ("[W]e find that [Officer] Wilson had reasonable cause to believe that [the defendant] might be carrying a concealed weapon and that the investigatory stop and limited pat-down search for weapons were warranted to protect himself and others who might be in danger.").

[7] Appellant's counsel acknowledged in oral argument that appellant never asserted in the trial court that Sergeant Tennis lacked probable cause to seize the small bag containing the illegal drugs – which Sergeant Tennis first observed on the ground, partially covered by appellant's foot, when appellant was not complying with the procedures for the officer's pat-down search of him for weapons and was actively attempting to prevent Sergeant Tennis from moving his foot.

### III. CONCLUSION

By the time that appellant finally actually submitted to Sergeant Tennis's show of authority – and, therefore, was seized for the purposes of the Fourth Amendment – several circumstances within the sergeant's knowledge had accumulated. They all contributed to providing a reasonable police officer with reasonable, articulable suspicion that appellant was connected with criminal activity that was afoot. Thus, the investigatory detention of appellant did not violate the Fourth Amendment, and the trial court did not err when it denied appellant's motion to suppress the illegal drugs that were obtained during that investigatory detention.

Accordingly, for the foregoing reasons, we affirm appellant's convictions for possession of cocaine and possession of heroin with intent to distribute (third or subsequent offense).

Affirmed.