COURT OF APPEALS OF VIRGINIA

UNPUBLISHED

Present:   Judges Beales, Chafin and Senior Judge Bumgardner
Argued at Chesapeake, Virginia


FRANK SMALL

MEMORANDUM OPINION[*] BY
v.        Record No. 1722-15-1                    JUDGE RANDOLPH A. BEALES
                                                  DECEMBER 13, 2016
COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF THE CITY OF SUFFOLK
L. Wayne Farmer, Judge

Jack T. Randall (Randall Page, P.C., on brief), for appellant.

Elizabeth Kiernan Fitzgerald, Assistant Attorney General (Mark R.
Herring, Attorney General, on brief), for appellee.


Frank Small was convicted of robbery in violation of Code § 18.2-58.  On appeal, appellant

argues that the evidence was insufficient to support his conviction for robbery.  For the following

reasons, we affirm appellant's conviction.

I. BACKGROUND

We consider the evidence on appeal "in the light most favorable to the Commonwealth, as

we must since it was the prevailing party" in the trial court.  Beasley v. Commonwealth, 60

Va. App. 381, 391, 728 S.E.2d 499, 504 (2012) (quoting Riner v. Commonwealth, 268 Va. 296,

330, 601 S.E.2d 555, 574 (2004)).  So viewed, the evidence proved that on February 27, 2014, a

man named Harry Small ("Harry") knocked on Wilfrid Gwaltney's ("Gwaltney") residence in

Suffolk, Virginia.  Gwaltney, born in 1933, was approximately 80 years old at the time.  Harry,

unsolicited, informed Gwaltney that he could repair Gwaltney's driveway, which Gwaltney

---

[*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

agreed could use some minor repairs. Harry told Gwaltney that he had two to three yards of gravel left from a previous project that he could lay, and it would cost two to three dollars per yard. Gwaltney ended up hiring Harry, who returned with two additional workmen, Benny York ("York") and Frank Small ("Frank" or "appellant"). Harry and York returned to Gwaltney's house in a yellow Chevrolet dump truck. Appellant followed behind in a black pickup truck. They all arrived at approximately 10:00 a.m. and began work. Gwaltney did not stay outside for the entire process, as he received a telephone call. About two hours later, when Harry, York, and appellant were finished repairing the driveway, Gwaltney noticed that they had done more on the driveway than he had originally asked. However, he thought that the repairs to the driveway looked good, and he did not expect the price to be significantly higher. He testified, "My guess in my mind was around $300.00." When Gwaltney came back outside from retrieving his checkbook, appellant and Harry were standing in the backyard, side-by-side, each holding a shovel. They told Gwaltney that he owed them $8,100.

The Commonwealth produced evidence at trial that a dump truck with fourteen tons of gravel (the legal limit for a load on the truck the size of the workmen's yellow dump truck) only costs about $300. Even appellant agreed on cross-examination that $8,100 was "not a fair price" for the gravel. Gwaltney testified that he told the men that he did not think the price was right and that he was not going to pay that much money. Gwaltney testified that appellant – still two feet away and holding his shovel – stated that "[Gwaltney's] kids would find [him] behind the house that night if [he] didn't pay him." While appellant said this, he tapped his shovel on the ground for emphasis. Gwaltney testified that he believed appellant "meant what he said" and would follow through if Gwaltney did not follow directions. Gwaltney testified, "I was scared at the time, we were standing in the yard, and he had that shovel in his hand tapping the ground with it. That was – that was going to be his weapon if he needed it." Gwaltney immediately

drove to the bank to withdraw the money to pay the men (appellant told him they would not accept a check), feeling that he "didn't have a choice." Gwaltney testified that he was fearful for himself and his family. His local BB&T bank branch was about ten minutes away from his home, and appellant followed him there. Appellant admitted that he followed Gwaltney, testifying, "Harry asked me to follow [Gwaltney] to the bank." Gwaltney withdrew eighty-one $100 bills, which was the majority of the money in his bank account. Appellant did not enter the BB&T with Gwaltney. After leaving the bank, Gwaltney drove his car across the street to the gas station where appellant was waiting. During this time, Gwaltney testified that he was thinking of the defendant's threat to "do [him] damage" and was in fear.

Appellant then walked up to the driver's side door and opened it. Gwaltney handed appellant the money. As appellant turned to leave, Gwaltney asked for a receipt. Appellant then turned around and sat in Gwaltney's vehicle beside Gwaltney and counted the cash. On cross-examination, Gwaltney was asked, "Now, during this time you were still in fear, right?" Gwaltney responded, "Yes." When asked of what he was afraid, Gwaltney testified that he was in fear of "what may happen after all of it. I couldn't – after he had threatened to do me damage –" At this point, appellant's counsel interrupted and the Commonwealth objected to the interruption. Gwaltney was again asked, "The question was Mr. Gwaltney, what were you afraid of at that point." Gwaltney responded, "At that particular point I don't know as I had a lot of fear of any kind, other than the fact that if I give him the money, he's not going to bother me or do damage to me or the kids." Later in his cross-examination, appellant's counsel attempted to characterize Gwaltney's earlier statement as an admission that he was not afraid while appellant counted the money. Gwaltney responded, "I didn't know that I testified that I didn't – wasn't in fear at all. I had – I had some fear the whole day."

- 3 -

After Gwaltney asked appellant for a receipt, appellant made a phone call and asked for a receipt to give to Gwaltney.  Gwaltney testified that appellant then told him to drive to the other side of the gas station to get his receipt.  Appellant exited the vehicle, and Gwaltney drove to the other side of the gas station and got a "receipt" from York.  The "receipt" was on a sheet of paper without a logo or identifying information about the workmen or a company.  The receipt also listed significant amounts of labor not performed by the men.  Appellant, who testified in his defense at trial, admitted that he was a nine-time convicted felon and that he had been convicted of at least three misdemeanors involving lying, cheating, or stealing.

A jury convicted appellant of robbery in violation of Code § 18.2-58.  In ruling on the defense's motion to set aside the verdict, the trial court found that Gwaltney's testimony was "entirely believable and credible."  The trial court further noted that appellant "made a threat. The victim had no reason to believe that [appellant] wasn't intent on carrying out that threat if he did not receive the funds."

## II. ANALYSIS

### A. Standard of Review

When considering the sufficiency of the evidence on appeal, "a reviewing court does not 'ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.'"  Crowder v. Commonwealth, 41 Va. App. 658, 663, 588 S.E.2d 384, 387 (2003) (quoting Jackson v. Virginia, 443 U.S. 307, 318-19 (1979)) (emphasis in original).  "Viewing the evidence in the light most favorable to the Commonwealth, as we must since it was the prevailing party in the trial court," Riner v. Commonwealth, 268 Va. 296, 330, 601 S.E.2d 555, 574 (2004), "[w]e must instead ask whether '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt,'" Crowder, 41 Va. App. at 663, 588 S.E.2d at 387 (quoting Kelly v. Commonwealth, 41 Va. App. 250, 257, 584 S.E.2d 444, 447 (2003) (*en banc*)) (emphasis in

- 4 -

original). See also Maxwell v. Commonwealth, 275 Va. 437, 442, 657 S.E.2d 499, 502 (2008). "This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." Jackson, 443 U.S. at 319.

### B. Whether the Intimidation was Concomitant With the Taking

Appellant argues in his assignment of error that "the Commonwealth failed to prove beyond a reasonable doubt that the fear or intimidation was closely related enough in time and place, so as to exist immediately prior to or contemporaneously with the taking of Gwaltney's cash." By contrast, the Commonwealth argues on brief, "The defendant has cited no other authority for judicially limiting how long one can be intimidated. To the contrary, the victim's mental state – much like the defendant's intent – remains a factual issue reserved to the jury."

> Robbery is a common law crime against the person, which is proscribed statutorily by Code § 18.2-58. Robbery at common law is defined as, "the taking, with the intent to steal, of the personal property of another, from his person or in his presence, against his will, by violence or intimidation."

Clay v. Commonwealth, 30 Va. App. 254, 258, 516 S.E.2d 684, 685-86 (1999) (*en banc*) (quoting Crawford v. Commonwealth, 217 Va. 595, 597, 231 S.E.2d 309, 310 (1977)) (internal citations omitted). "The alternative elements of violence or intimidation have been further defined as the use of 'force, threat, or intimidation.'" Bivens v. Commonwealth, 19 Va. App. 750, 752, 454 S.E.2d 741, 742 (1995) (quoting Clay v. Commonwealth, 13 Va. App. 617, 619, 414 S.E.2d 432, 433 (1992)). "Intimidation is defined as 'unlawful coercion; extortion; duress; putting in fear.'" Id. (quoting Black's Law Dictionary 831 (6th ed. 1990)). As this Court has noted before, "'the word "fear" in connection with robbery does not so much mean "fright" as it means "apprehension"; one too brave to be frightened may yet be apprehensive of bodily harm' and, therefore, make a calculated decision to surrender money to the robber." Seaton v.

Commonwealth, 42 Va. App. 739, 749, 595 S.E.2d 9, 14 (2004) (quoting 3 Wayne R. LaFave, Substantive Criminal Law § 20.3(d), at 187-88 (2d ed. 2003)) (emphasis omitted).

Here, Gwaltney was undoubtedly intimidated by appellant. Appellant, standing with Harry, told Gwaltney that if he did not give them the money they demanded, Gwaltney's children would find him behind his house. This statement combined with appellant's act of tapping his heavy shovel on the ground to emphasize his present ability and willingness to hurt Gwaltney – and Gwaltney's understanding that appellant knew he lived alone – show that appellant intimidated Gwaltney. Appellant argues that this act cannot be properly related to the taking of the money, which occurred when Gwaltney allowed appellant to take the $8,100. "The act of violence or intimidation must precede or be concomitant with the taking." Bivens, 19 Va. App. at 752, 454 S.E.2d at 742. There is no requirement that the intimidation *immediately* precede the taking; rather the requirement is that the taking *result from* the violence or intimidation. "If the violence or intimidation preceded or was concomitant with the taking, the offense of robbery is established; if the taking was accomplished *before* the violence toward or intimidation of [the victim] then it was not robbery." Mason v. Commonwealth, 200 Va. 253, 255, 105 S.E.2d 149, 151 (1958) (emphasis added). Appellant argues that his intimidating acts could not have caused the taking for three main reasons: first, the taking occurred in a different location; second, there was a break in the sequence of events; and third, Gwaltney was no longer "in fear" when he actually handed the money to appellant.

Neither party disputes that whether Gwaltney remained intimidated at the time he relinquished the money to appellant is a question of fact to be resolved by the factfinder. The taking of the money occurred in a different location and twenty to thirty minutes after appellant threatened Gwaltney. However, appellant followed Gwaltney into town and remained parked right across the street from the bank where Gwaltney went to withdraw the money. Gwaltney

- 6 -

was aware that appellant knew where Gwaltney lived, knew that he was elderly, and knew that he lived alone. All of these facts could reasonably put a person in Gwaltney's position in fear for his safety as he was driving to the bank and as he parted with the $8,100 in cash. See Sutton v. Commonwealth, 228 Va. 654, 665, 324 S.E.2d 665, 671 (1985) (declining to decide whether a victim's fear must be judged by an objective standard, but nevertheless applying an objective standard to conclude that the victim's fear was reasonable); see also Briley v. Commonwealth, 221 Va. 532, 273 S.E.2d 48 (1980) (upholding a felony (robbery) murder conviction based on a robbery that took place over the course of fifteen to twenty minutes); Person v. Commonwealth, 10 Va. App. 36, 389 S.E.2d 907 (1990) (upholding a robbery conviction based on a robbery that took place over at least fifteen to twenty minutes).

Appellant asserts that Gwaltney's testimony shows that he was not fearful of appellant immediately before he gave appellant the cash. Appellant relies on Gwaltney's statement, "At that particular point I don't know as I had a lot of fear of any kind, *other than* the fact that if I give him the money, he's not going to bother me or do damage to me or the kids." (Emphasis added). However, this testimony clearly suggests that there *was* one thing of which Gwaltney was clearly afraid: if he did not give appellant $8,100, he might well get hurt. This is especially obvious when taken together with the rest of Gwaltney's repeated representations that he was in fact in fear for the duration of the exchange of the money – and even some time after. Moreover, even if there could be any confusion with Gwaltney's statement, when appellant's counsel pressed Gwaltney to admit that he was not afraid, Gwaltney responded, "I didn't know that I testified that I didn't – wasn't in fear at all. I had – I had some fear the whole day." The trial court, and the jury by implication, found Gwaltney's testimony credible. We find that the trier of fact could have concluded that Gwaltney was in fear for his safety, as a result of appellant's intimidating words and acts, at the time Gwaltney gave appellant the money.

Therefore, we hold that a factfinder reasonably could have concluded that Gwaltney obtained the $8,100 and allowed appellant to take the money because, at the time he parted with the money, his will was overborne.  Gwaltney was still intimidated and fearful that appellant would hurt him if he did not comply with appellant's demand that he give up the $8,100.

### III.  CONCLUSION

In short, we hold that a rational trier of fact could have concluded that appellant's words and acts intimidated Gwaltney sufficiently to cause him to part with the $8,100 that appellant demanded.  Consequently, we affirm appellant's conviction.

<u>Affirmed.</u>