COURT OF APPEALS OF VIRGINIA

Present: Judges Petty, O'Brien and Senior Judge Clements
Argued by videoconference

UNPUBLISHED

SENORA LUCHILLE COBB, S/K/A
 SENORA LUCHILE COBB

 MEMORANDUM OPINION* BY
v.     Record No. 0180-20-1     JUDGE JEAN HARRISON CLEMENTS
 APRIL 27, 2021

COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF THE CITY OF NORFOLK
John R. Doyle, III, Judge[1]

J. Barry McCracken, Assistant Public Defender, for appellant.

Mason D. Williams, Assistant Attorney General (Mark R. Herring,
Attorney General, on brief), for appellee.


The trial court convicted appellant of child abuse or neglect, in violation of Code

§ 18.2-371.1(A). Asserting that she was illegally detained, appellant contends the trial court erred in

denying her motion to suppress statements she made to police on July 28, 2018. Appellant also

challenges the sufficiency of the evidence to prove that she caused or suffered her child to sustain

serious bodily harm. We affirm her conviction.

BACKGROUND

"In accordance with familiar principles of appellate review, the facts will be stated in the

light most favorable to the Commonwealth, the prevailing party at trial." Gerald v. Commonwealth,

295 Va. 469, 472 (2018) (quoting Scott v. Commonwealth, 292 Va. 380, 381 (2016)). In doing so,

---

* Pursuant to Code § 17.1-413, this opinion is not designated for publication.

[1] Judge Joseph A. Migliozzi, Jr. presided over the pre-trial motion to suppress. Judge
John R. Doyle, III presided over the bench trial.

we discard any of appellant's conflicting evidence and regard as true all credible evidence favorable to the Commonwealth and all inferences that may reasonably be drawn from that evidence. Id. at 473. On July 28, 2018, Norfolk firefighter Carlton Twiford responded to an apartment in Norfolk for a nonresponsive child call. When he arrived outside, an unknown man led him to the apartment where the child was located. Several adults were in the apartment, and appellant acknowledged that she was the child's mother. Appellant pointed to seventeen-month-old A.C., who was lying on a tile floor wearing only a diaper. A.C. was cold to Twiford's touch and unresponsive. A.C. was not breathing well; he had agonal respirations. When Twiford picked up A.C., "he was completely limp." Twiford carried A.C. to a waiting ambulance "to start vital care," and appellant followed. Twiford noted that appellant was not crying and did not appear panicked. A.C. was transported to the hospital by ambulance. During the transport to the hospital, A.C. had to be intubated because he was not breathing.

Norfolk Police Detectives Jennifer Barron and Michael Chafee went to the hospital that day for an unresponsive child complaint and immediately checked on A.C. The detectives noted that A.C. was unconscious, with a collar on his neck, and several tubes in his nose. Detective Barron took several photographs depicting A.C.'s condition that day. The detectives then met with appellant at the hospital to conduct a preliminary investigation into what had happened to A.C. Detective Chafee testified that this "was literally the first contact with anyone. This was our first step in the investigation, with her child, was to talk to the mother." Two Child Protective Services workers accompanied the detectives.

They interviewed appellant in a fifteen-by-ten foot, windowless waiting room that was arranged "like a lounge" with five or six chairs and two or three end tables. Although a uniformed patrol officer was present outside of the room when the detectives arrived, the detectives

let the uniformed officer leave. The door to the room was closed, but not locked. Detective Chafee estimated that the conversation lasted forty minutes.

The detectives identified themselves as being with the Norfolk Police Department and accompanied by CPS and stated that they "were interested in finding out what happened" to A.C. Appellant was not forced or threatened to speak with the detectives at the hospital and was not told she could not leave. After the detectives explained why they were there, appellant spoke with them. Appellant was free to leave at any time.

Appellant told the detectives that A.C. and his brothers played "roughly," and A.C.'s older brother also reportedly hit A.C. with a toy fire truck. In addition, when he had temper tantrums, A.C. would throw himself down and bang his head on the concrete floor. Appellant also stated that earlier that day, she had let A.C. go to a playground with two girls from the neighborhood for about an hour.[2] Appellant stated that A.C. was "normal" when he went to the park, but when he returned, he acted tired, wanted to sleep, and was not "himself." Unsure whether A.C. needed medical attention, appellant took him to an upstairs neighbor, who recommended that they call 911.

Child abuse pediatrician Dr. Amber Shipman was qualified by the trial court as an expert in child abuse pediatrics. When she examined A.C. on July 29, 2018, he was in critical condition. A.C. had been intubated to help him breathe. A.C. had bleeding in several parts of his brain, so providers had placed a bolt in A.C.'s head to relieve pressure on his brain from the bleeding. In addition, A.C. required low blood pressure support, which Dr. Shipman attributed to his body's inability to regulate his blood pressure because of the numerous brain injuries. Dr. Shipman noted three areas of bruising on A.C.'s forehead and bruises on his scalp above his left ear, on his left lower abdomen, and on the pinna of his right ear. A.C.'s forehead bruises were also swollen,

---

[2] Detectives were never able to locate the two neighborhood girls who reportedly took A.C. to the park.

indicating that he was bleeding into the tissue from blunt-force trauma. A.C. had two abrasions on his abdomen, another on his upper outer right thigh, multiple abrasions on his left eye and upper left eyelid, and one below his left eye from his cheek to his nose. A.C.'s liver enzymes were also elevated, indicating a contusion, or bruising of the liver.

When A.C. arrived at the hospital, he weighed fourteen pounds and eight ounces. Dr. Shipman testified that at this weight, A.C. was considered severely malnourished. A.C. was very small, had minimal underlying fat, very little muscle tone, and excess skin folds under his arms and legs, which is often seen in malnourished children. Despite Dr. Shipman's numerous attempts to contact appellant to gather information, she was unsuccessful in reaching appellant.

Family service worker Tynisha Brewer was assigned to A.C.'s case and went to the hospital on July 29, 2018. Brewer noted that A.C. had a surgical bolt in his head, three large knots across his forehead, and numerous bruises across his face, arms, chest, legs, and back. Brewer also noted that A.C. had "hanging skin" along his thighs and his collar bones were visible. Brewer did not see appellant at the hospital on July 29, 2018. A.C.'s foster care case was assigned to family service worker Alisa Gaskins on July 30, 2018. Gaskins noted that A.C. had tubes coming out of different parts of his body "to assist him" and he was unresponsive. The hospital room had very little light, and visitors could not touch A.C. or make excessive noise. Appellant contacted Gaskins to ask about her two older children, who also had been placed in foster care, but did not inquire about A.C. or his condition.

A.C. remained in the hospital for a month and two days. After he was discharged from the hospital, A.C. went to live with a foster family in Chesapeake. A.C.'s condition improved once he was placed in the foster home. Appellant was arrested on August 8, 2018 and charged with child abuse or neglect.

Following her arrest, appellant moved to suppress the statements she made to the detectives during her interview at the hospital.[3] Appellant argued that the circumstances of the interview amounted to a custodial interrogation and the detectives had not advised her of her Miranda[4] rights. The Commonwealth responded that appellant was not in custody at the time of the interview.

At the suppression hearing, appellant testified that the hospital chaplain had escorted her to the waiting room. At some point, the chaplain left, and two uniformed police officers entered the room. The uniformed officers asked appellant a few demographic questions, then told her to remain in the room. Appellant stated that the officers left the room and closed the door; she waited for about thirty minutes until the detectives arrived. At one point, appellant "stuck her head out the door" and asked to use the restroom, but the officer told her no that she "had to remain in the room until the detectives came" to speak with her. Appellant stated that the officers were standing on either side of the door. Appellant agreed that the officers did not tell her she was under arrest or handcuff her. The trial court denied the motion to suppress appellant's hospital interview statements. The trial court found that the interview was not custodial, that the detectives were just investigating to learn what happened to the child. The trial court further found that appellant was free to leave.

At the subsequent bench trial, appellant argued that the evidence did not indicate that she caused or permitted serious injury to A.C. The trial court overruled appellant's motions to strike, convicted her of child abuse or neglect, and sentenced her to three years and six months' imprisonment, with three years suspended. This appeal follows.

---

[3] The trial court granted appellant's motion to suppress statements she made following her arrest.

[4] Miranda v. Arizona, 384 U.S. 436 (1966).

ANALYSIS

A. Appellant's hospital interview statements were not subject to suppression.

"In reviewing the denial of a motion to suppress based on the alleged violation of an individual's Fourth Amendment rights, we consider the evidence introduced at both the suppression hearing and the trial." Bagley v. Commonwealth, 73 Va. App. 1, 12-13 (2021) (citing Beasley v. Commonwealth, 60 Va. App. 381, 385 n.1 (2012)). This Court examines the trial court's application of the law *de novo*; however, we defer to the trial court's findings of fact. Id. at 13. Appellant argues that the trial court erred in denying her motion to suppress her hospital interview statements because she was illegally detained and the detectives did not have reasonable and articulable suspicion of illegal activity.

The Fourth Amendment protects individuals against unreasonable seizures. U.S. Const. amend. IV. But not every encounter between a police officer and a private citizen is a seizure. Florida v. Bostick, 501 U.S. 429, 434 (1991). "Law enforcement officers may approach a citizen in public places and engage in consensual encounters involving questioning of the citizen, if the citizen is willing to listen, without violating the Fourth Amendment's prohibition of unreasonable seizures." Jones v. Commonwealth, 279 Va. 521, 528 (2010). "As long as the police do not convey, by word or deed, that compliance with their request is mandatory, there is no requirement that these encounters be based on an objective or particularized suspicion regarding the person approached." Montague v. Commonwealth, 278 Va. 532, 538 (2009).

"There is no bright-line test to determine whether an encounter is consensual, rather a consensual encounter inquiry is based on the totality of the circumstances." Middlebrooks v. Commonwealth, 52 Va. App. 469, 477 (2008). "An officer questioning a citizen exceeds the scope of his authority and effects a seizure only when, 'in view of all the circumstances surrounding the incident, a reasonable person would have believed that [s]he was not free to

leave.'" Barkley v. Commonwealth, 39 Va. App. 682, 692 (2003) (quoting California v. Hodari D., 499 U.S. 621, 628 (1991)). In situations where an individual's freedom of movement is restricted by a factor independent of police conduct, for example as a passenger in a bus, "the appropriate inquiry is whether a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter." Bostick, 501 U.S. at 436.

"A consensual encounter is not transformed into a seizure merely by the presence of police officers who are in uniform and armed." Jones, 279 Va. at 528. Factors used to determine if a seizure has occurred may include "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." Matthews v. Commonwealth, 65 Va. App. 334, 343 (2015) (quoting United States v. Mendenhall, 446 U.S. 544, 554 (1980)).

Considering the totality of the circumstances presented and applying the Mendenhall[5] factors here, we conclude that the hospital interview was a consensual encounter, not a seizure. Appellant was led to the private waiting room by a hospital chaplain and was present in the room when the detectives arrived. The two uniformed officers who initially were present asked appellant only for demographic information and did not touch appellant or advise her that she was under arrest. The uniformed officers left after the detectives arrived. There were never more than two officers in appellant's presence, and although each possessed a service weapon, none drew his or her weapon.

Appellant did not attempt to leave the waiting room; instead, she "stuck her head out the door" and asked to use the restroom. In response, an officer told her to wait for the detectives. There is no evidence that the officers' request that appellant remain in the waiting room for the

_____

[5] 446 U.S. at 554.

detectives to arrive was mandatory. Appellant chose to comply with that request rather than reiterate her request or simply leave. "While most citizens will respond to a police request, the fact that people do so, and do so without being told they are free not to respond, hardly eliminates the consensual nature of the response." I.N.S. v. Delgado, 466 U.S. 210, 216 (1984).

No evidence indicated that anyone physically touched appellant, or that the language or tone of voice the uniformed officers or detectives used was inappropriate or aimed at compelling appellant's compliance. The detectives did not tell appellant that she was under arrest or suspected of an offense. In fact, they were conducting a "preliminary investigation to try and understand what happened to [A.C.]" and communicated that to appellant. Consistent with the preliminary nature of the interview, two CPS workers were present during the interview. Although the door of the room was closed, it was not locked. Appellant was not threatened or forced to speak with the detectives. The detectives did not tell appellant that she could not leave. The interview lasted forty minutes. Appellant was free to leave if she wanted. Under these circumstances, a reasonable person would have felt free to decline the officers' requests or otherwise terminate the encounter. Bostick, 501 U.S. at 436. Accordingly, this was a consensual encounter and the trial court did not err in denying appellant's motion to suppress her hospital interview statements.[6]

> B. The evidence supports appellant's conviction for child abuse or neglect.

"When reviewing the sufficiency of the evidence, '[t]he judgment of the trial court is presumed correct and will not be disturbed unless it is plainly wrong or without evidence to

---

[6] Given our conclusion that the encounter at the hospital was consensual, we need not, and therefore do not, address the Commonwealth's alternative argument that the detectives had a reasonable and articulable suspicion of illegal activity. See, e.g., McArthur v. Commonwealth, 72 Va. App. 352, 369 (2020) (noting our mandate to decide cases on the best and narrowest grounds).

support it.'" Smith v. Commonwealth, 296 Va. 450, 460 (2018) (quoting Commonwealth v. Perkins, 295 Va. 323, 327 (2018)). "In such cases, '[t]he Court does not ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.'" Secret v. Commonwealth, 296 Va. 204, 228 (2018) (quoting Pijor v. Commonwealth, 294 Va. 502, 512 (2017)). Instead, we ask "whether *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Id. (quoting Pijor, 294 Va. at 512). "If there is evidentiary support for the conviction, 'the reviewing court is not permitted to substitute its own judgment, even if its opinion might differ from the conclusions reached by the finder of fact at the trial.'" Chavez v. Commonwealth, 69 Va. App. 149, 161 (2018) (quoting Banks v. Commonwealth, 67 Va. App. 273, 288 (2017)).

"Circumstantial evidence is as competent and is entitled to as much weight as direct evidence, provided it is sufficiently convincing." Pijor, 294 Va. at 512 (quoting Dowden v. Commonwealth, 260 Va. 459, 468 (2000)). "[C]ircumstantial evidence [must be] sufficiently convincing to exclude every reasonable hypothesis except that of guilt." Kelley v. Commonwealth, 69 Va. App. 617, 629 (2019) (quoting Pijor, 294 Va. at 512). This principle, however, "does not add to the burden of proof placed upon the Commonwealth in a criminal case." Commonwealth v. Hudson, 265 Va. 505, 513 (2003). "[T]he Commonwealth need only exclude reasonable hypotheses of innocence that flow from the evidence, not those that spring from the imagination of the defendant." Ragland v. Commonwealth, 67 Va. App. 519, 531 (2017) (quoting Case v. Commonwealth, 63 Va. App. 14, 23 (2014)).

"In its role of judging witness credibility, the fact finder is entitled to disbelieve the self-serving testimony of the accused and to conclude that the accused is lying to conceal [her] guilt." Flanagan v. Commonwealth, 58 Va. App. 681, 702 (2011). "A defendant's false statements are probative to show [she] is trying to conceal [her] guilt, and thus is evidence of

[her] guilt." Taylor v. Commonwealth, 61 Va. App. 13, 31 (2012) (quoting Rollston v. Commonwealth, 11 Va. App. 535, 548 (1991)).

Code § 18.2-371.1(A) provides, in part, "Any parent, guardian, or other person responsible for the care of a child under the age of 18 who by willful act or willful omission . . . causes or permits serious injury to the life or health of such child is guilty of a Class 4 felony." Under the statute, a serious injury "includes but is not limited to (i) disfigurement, (ii) a fracture, (iii) a severe burn or laceration, (iv) mutilation, (v) maiming, (vi) forced ingestion of dangerous substances, and (vii) life-threatening internal injuries." Id. "'Willful' generally means an act done with a bad purpose, without justifiable excuse, or without ground for believing it is lawful. The term denotes 'an act which is intentional, or knowing, or voluntary, as distinguished from accidental.'" Ellis v. Commonwealth, 29 Va. App. 548, 554 (1999) (quoting Snead v. Commonwealth, 11 Va. App. 643, 646 (1991)). "The term 'willful act' imports knowledge and consciousness that injury will result from the act done." White v. Commonwealth, 68 Va. App. 111, 119 (2017) (quoting Barrett v. Commonwealth, 268 Va. 170, 183 (2004)). But the term "willful act" does not require the Commonwealth to prove appellant intended to injure the child. Collado v. Commonwealth, 33 Va. App. 356, 366 (2000). Instead, "[t]he *act* done must be intended or it must involve a reckless disregard for the rights of another and will probably result in an injury." White, 68 Va. App. at 119 (emphasis added) (quoting Barrett, 268 Va. at 183).

Appellant concedes that A.C. suffered a serious injury. Nevertheless, appellant argues that the evidence was insufficient to support her conviction because the evidence did not establish that she was the criminal agent. We disagree.

When Twiford responded to the apartment, appellant "pointed" to A.C. and said, "he's over here." Twiford found A.C. lying on a tile floor, nonresponsive with "agonal respirations." A.C. was cold to the touch and "completely limp" when Twiford lifted him. Twiford

immediately took A.C. to an ambulance for "vital care," which included intubation. In contrast to Twiford's immediate and complete focus on A.C.'s care given his obviously fragile condition, appellant appeared indifferent to his plight.

The medical evidence established that A.C. suffered bleeding in several parts of his brain and bruising on his liver. The brain injuries were so severe that A.C.'s room had to be kept dark, and visitors could not make noise or touch him, and doctors had to install a bolt in his head to relieve pressure from the bleeding. Doctors also had to regulate A.C.'s blood pressure because the brain injuries had inhibited his body's ability to "function normally." In addition to the internal injuries, A.C. had knots and bruises across his forehead, numerous bruises on his abdomen, ear, and scalp, and multiple abrasions on his abdomen, face, and thigh. A.C. also was severely malnourished, as evidenced by a lack of underlying fat, poor muscle tone, and excess skin folds under his arms and legs.

Appellant provided several explanations for A.C.'s injuries. Appellant told detectives that A.C.'s brother hit him with a toy fire truck, that A.C. routinely threw himself down and hit his head on a concrete floor, and that A.C. went to the playground with two girls from the neighborhood for about an hour that day. But appellant's explanations were not consistent with the medical evidence.

Dr. Shipman stated that A.C.'s injuries were in multiple planes of his body, with varying levels of penetration into his face. Thus, the breadth of A.C.'s injuries was uncharacteristic of a single impact; multiple impacts, however, would explain A.C.'s injuries. A fall at the playground and being struck by a toy fire truck did not sufficiently account for the extent of A.C.'s injuries because bleeding in A.C.'s brain was widespread in multiple locations, and Dr. Shipman explained that "we don't expect to see that kind of distribution of bleeding when there is a single impact."

Moreover, the specific injuries to A.C.'s ear concerned Dr. Shipman because the ear is "well-protected by the head and shoulder in the case of a fall" and very difficult to bruise because it is "not very vascular." Thus, ear bruises indicate "some type of significant and direct trauma to the ear." Similarly, Dr. Shipman testified that abdominal injuries are "fairly rare in children as far as accidental injuries go" because they require direct trauma to usually protected areas. Dr. Shipman also noted that it takes significant force to cause bruising to the abdomen because it is very soft. Such injuries, Dr. Shipman explained, raise concern for "non-accidental or otherwise inflicted trauma because of the force it takes."

The trial court found that appellant was A.C.'s parent and responsible for A.C.'s care. The trial court also found that appellant was either "the one striking this child," or she permitted "his condition to deteriorate and allowed" the trauma Dr. Shipman identified to be inflicted upon him. The trial court expressly rejected appellant's explanation to the detectives about A.C.'s trip to the playground, and permissibly concluded that she had lied to conceal her guilt. Taylor, 61 Va. App. at 31.

Upon review, we conclude that credible evidence supports the trial court's finding of appellant's guilt. Accordingly, we affirm appellant's conviction.

Affirmed.