COURT OF APPEALS OF VIRGINIA

Present:  Judges Humphreys, Decker and O'Brien
Argued at Norfolk, Virginia

PUBLISHED

PATRICK DARNELL HILL

OPINION BY
v.      Record No. 0482-17-1          JUDGE MARY GRACE O'BRIEN
                                       APRIL 24, 2018

COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF THE CITY OF PORTSMOUTH
William S. Moore, Jr., Judge

Stephanie J. Pough (Eric O. Moody and Associates, P.C., on brief),
for appellant.

Robert H. Anderson, III, Senior Assistant Attorney General
(Mark R. Herring, Attorney General, on brief), for appellee.


Patrick Darnell Hill ("appellant") was indicted for possession of a Schedule I or II controlled

substance with intent to distribute, third offense, in violation of Code § 18.2-248. Appellant filed a

motion to suppress evidence recovered during a search of his vehicle, claiming that police officers

improperly seized him and the drugs found in his car in violation of his Fourth Amendment rights.

The court denied his motion, and appellant entered a conditional guilty plea to the lesser-included

offense of possession with intent to distribute as a second offense, preserving his right to appeal

pursuant to Code § 19.2-254. Finding no error in the court's denial of appellant's suppression

motion, we affirm.

BACKGROUND

In an appeal of the denial of a motion to suppress evidence, we review the facts in the light

most favorable to the prevailing party, the Commonwealth. Aponte v. Commonwealth, 68 Va. App.

146, 156, 804 S.E.2d 866, 870 (2017). So viewed, the evidence established that on the afternoon of

April 5, 2016, Detectives Hunter and Whitson of the Portsmouth Police Department were "investigating some narcotics complaints" in the 600 block of Newport Avenue in the City of Portsmouth. Detective Hunter had been assigned to a unit specializing in narcotics transactions for two-and-a-half years of his seven years on the police force. Detective Whitson, a twenty-one-year employee of the police department, had been with the narcotics unit for four years.

Both detectives identified the 600 block of Newport Avenue as "a high drug, high crime area." Detective Whitson testified that he had previously "made several [drug arrests] in that area, mostly right behind that area." Detective Hunter confirmed that he had also "been [to] several places in that area . . . about drug sales."

The detectives observed appellant sitting alone in a black Lexus, leaning back in the driver's seat and "[not] moving around." The vehicle was parked in front of a fence that bordered a "shop of some sort." The detectives drove their unmarked police car past the Lexus and executed a U-turn, without activating their lights or siren. As the detectives again approached the Lexus in their car, appellant looked in their direction. The detectives parked approximately twenty-five feet away and watched appellant's car for "a minute or so." During that period, the detectives observed appellant make "a bunch of movement inside of the vehicle" by repeatedly "looking up and down."

Detective Hunter testified that based on the character of the location and his experience with drug dealers waiting for their clients in "a secluded area," he was investigating possible narcotics activity. The detectives, who were wearing police vests and patches, exited their car and started walking toward the Lexus. Appellant again looked in their direction and immediately began to engage in more extensive movement inside the car. The detectives observed appellant place his left hand on the steering wheel, turn his back and head away from them, and use his right hand to "d[i]g down" next to the driver's seat. Neither detective was able to see what, if anything, was in appellant's right hand.

- 2 -

Concerned for their safety, the detectives verbally identified themselves as police officers and demanded that Hill show his hands. Detective Hunter later told appellant "that he thought [appellant] had a firearm [based on] the way he was acting and the way he was pulling away, reaching." Appellant did not obey the detectives' orders, and his right hand remained out of view. After shouting at appellant "at least ten times" to show his hands, the detectives grabbed appellant's left forearm, physically removed him from the vehicle, and placed him in handcuffs.

Once appellant was secured, Detective Hunter looked under the rear portion of the driver's seat where appellant had been reaching. There, he found a plastic bag containing individually wrapped rocks of crack cocaine. Appellant was subsequently charged with drug possession.

Appellant filed a motion to suppress the seized evidence and following a hearing, the court denied the motion. The court ruled that "the officers acted properly and in a constitutional manner and had reasonable articulable suspicion for what they did." On appeal, appellant's sole argument is that the detectives lacked reasonable suspicion for an investigative detention and subsequent search of the vehicle.[1]

---

[1] Appellant's single assignment of error alleges that "his Fourth Amendment rights against illegal search and seizure were violated [because] the officers lacked a reasonable, articulable suspicion that [he] was engaged in criminal activity when he was found in a high crime area and did not respond to the officers' commands to show his hands." He challenges the investigative detention, his removal from the vehicle, and the "recover[y of] the suspected controlled substance" on this ground. He does not challenge the officers' seizure of the drugs from his car on any other basis. See Commonwealth v. Brown, 279 Va. 235, 240-42, 687 S.E.2d 742, 744-45 (2010) (emphasizing that "[o]nly questions presented in the petition for appeal will be noticed by the Court of Appeals" and reversing a holding of the Court of Appeals that itself reversed a ruling of the trial court on a ground on which the defendant did not assign error, despite his preservation of the issue in the trial court (quoting Rule 5A:12(c))). Additionally, appellant did not preserve a separate challenge to the seizure of the drugs in the trial court as required by Rule 5A:18, and he does not ask the Court on appeal to invoke any exceptions to that rule's finality principles. See Edwards v. Commonwealth, 41 Va. App. 752, 760, 589 S.E.2d 444, 448 (2003) (en banc) (stating that the Court "do[es] not consider" an "exception to the rule sua sponte"), aff'd by unpub'd order, No. 040019 (Va. Oct. 15, 2004), cited with approval in Jones v. Commonwealth, 293 Va. 29, 39 n.5, 795 S.E.2d 705, 710 n.5 (declining to apply sua sponte one of the same exceptions to Rule 5:25, the Supreme Court of Virginia's counterpart to Rule 5A:18), cert. denied, 138 S. Ct. 81 (2017).

DISCUSSION

Upon review of the court's denial of a suppression motion, "the burden is upon [the appellant] to show that the ruling, when the evidence is considered most favorably to the Commonwealth, constituted reversible error." Andrews v. Commonwealth, 37 Va. App. 479, 488, 559 S.E.2d 401, 406 (2002) (quoting McGee v. Commonwealth, 25 Va. App. 193, 197, 487 S.E.2d 259, 261 (1997) (en banc)). "[W]e are bound by the trial court's findings of historical fact unless 'plainly wrong' or without evidence to support them[,] and we give due weight to the inferences drawn from those facts by resident judges and local law enforcement officers." McGee, 25 Va. App. at 198 & n.1, 487 S.E.2d at 261 & n.1. We review de novo the application of law to the court's factual findings. Watts v. Commonwealth, 38 Va. App. 206, 213, 562 S.E.2d 699, 703 (2002).

Appellant asserts that he was impermissibly seized in violation of his Fourth Amendment rights, and as a result, the cocaine found by the police officers should be suppressed. He contends that the evidence, viewed in its entirety, did not support the conclusion that the detectives had a reasonable articulable suspicion sufficient to seize him and search his vehicle.

A. Fourth Amendment Seizures

The Fourth Amendment of the United States Constitution, as incorporated in and applied to the states through the Fourteenth Amendment, guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." A person is not seized according to the Fourth Amendment until he submits to a police officer's show of authority. Cochran v. Commonwealth, 258 Va. 604, 608, 521 S.E.2d 287, 289 (1999); see also California v. Hodari D., 499 U.S. 621, 625 (1991); McGee, 25 Va. App. at 199, 487 S.E.2d at 262 (stating that no seizure occurs until "an individual is either physically restrained or has submitted to a show of authority"). "[T]here is no seizure without actual submission; otherwise, there is at most

- 4 -

an attempted seizure, so far as the Fourth Amendment is concerned." Brendlin v. California, 551 U.S. 249, 254 (2007). We addressed the issue of "submission to authority" in Beasley v. Commonwealth, 60 Va. App. 381, 728 S.E.2d 499 (2012). In Beasley, although the defendant and another passenger in a parked vehicle initially complied with an officer's directions to show their hands, they continued to make "furtive movements," and the defendant began reaching to the side of his seat. Id. at 386-88, 728 S.E.2d at 501-02. We held that it was not until the defendant responded to the officer's third command to keep his hands in his lap that he was seized for Fourth Amendment purposes. Id. at 394, 728 S.E.2d at 505. See also Jones v. Commonwealth, 52 Va. App. 548, 665 S.E.2d 261 (2008) (holding that the defendant was not seized until he stepped out of the vehicle because he did not submit to the detectives' authority until then).

Here, appellant did not comply with the detectives' requests to show his hands, and therefore he did not submit to their authority while sitting in the vehicle. The detectives were not required to articulate a suspicion of criminal behavior to explain their observation of appellant and their approach to his vehicle. Although Detectives Hunter and Whitson both testified that appellant was sitting in a parked car in an area known for drug transactions, and they were specifically investigating narcotics sales in that location, those facts were not necessary to justify their decision to approach the Lexus. Their initial interaction with appellant was constitutionally permissible; appellant was not seized at that point. No seizure occurred until the detectives physically removed him from the vehicle and placed him in handcuffs. It was only then that appellant submitted to their authority and was seized for purposes of the Fourth Amendment.

### B. Reasonable Articulable Suspicion

Having determined when the seizure of appellant occurred, we turn to whether the detectives had a reasonable articulable suspicion that, at the time of the seizure, appellant may have been involved in criminal activity. See Terry v. Ohio, 392 U.S. 1, 27 (1968); see also Jones, 52

- 5 -

Va. App. at 559, 665 S.E.2d at 267. The Supreme Court has described an "articulable suspicion" as a "conclusion that can be expressed in words sufficient to persuade a reasonable listener to come to a like conclusion." Mason v. Commonwealth, 291 Va. 362, 369, 786 S.E.2d 148, 152 (2016). However, "'[a]rticulable' does not mean 'articulated.'" Id. "A police officer conducting a stop is not required to precisely and individually articulate the facts that added up to suspicion in his mind." Id. (quoting United States v. Brown, 232 F.3d 589, 594 (7th Cir. 2000)).

> The test is not what the officer thought, but rather whether the facts and circumstances apparent to him at the time of the stop were such as to create in the mind of a reasonable officer in the same position a suspicion that a violation of the law was occurring or was about to occur.

Id. at 368, 786 S.E.2d at 151 (citing Scott v. United States, 436 U.S. 128, 138 (1978)).

Additionally, "[t]here is no 'litmus test' for reasonable suspicion." Jones, 52 Va. App. at 560, 665 S.E.2d at 267 (alteration in original) (quoting Harmon v. Commonwealth, 15 Va. App. 440, 445, 425 S.E.2d 77, 79 (1992)). "Whether an officer has a reasonable suspicion to justify . . . a detention is 'based on an assessment of the totality of the circumstances.'" Branham v. Commonwealth, 283 Va. 273, 280, 720 S.E.2d 74, 78 (2012) (quoting Harris v. Commonwealth, 276 Va. 689, 695, 668 S.E.2d 141, 145 (2008)). Reasonable suspicion "need not rule out the possibility of innocent conduct." Raab v. Commonwealth, 50 Va. App. 577, 581, 652 S.E.2d 144, 147 (2007) (en banc) (quoting United States v. Arvizu, 534 U.S. 266, 277 (2002)). A "series of acts," which appear innocent when viewed on an individual basis, may "collectively . . . [be] suspicious enough that a reasonable officer [will] ha[ve] grounds to stop [a defendant] for purposes of investigating the situation further." Id. (quoting Arvizu, 534 U.S. at 274). This assessment recognizes "the need [for] split-second decisions" and permits an officer "to view the circumstances confronting him in light of his training and experience." Atkins v. Commonwealth, 57 Va. App. 2, 19, 698 S.E.2d 249, 257 (2010) (quoting Scott v. Commonwealth, 20 Va. App. 725, 727, 460

S.E.2d 610, 612 (1995)).  See also Beasley, 60 Va. App. at 397, 728 S.E.2d at 506-07 (holding that when the defendant ignored three commands to keep his hands in his lap, the "accumulating factors, in their totality, provided a reasonable, articulable suspicion that criminal activity was afoot").

If an officer has reasonable suspicion "to believe criminal activity may be afoot," thereby justifying a stop, *and* believes that the person "may be armed and dangerous," the officer may lawfully conduct a pat-down search for weapons.  Lowe v. Commonwealth, 33 Va. App. 656, 660-61, 536 S.E.2d 454, 456-57 (2000).  An officer is also entitled to conduct a "search [of] the accessible areas of the passenger compartment of the car in which a weapon might be hidden" if the officer has reasonable suspicion that a lawfully detained suspect in a stationary vehicle is armed and dangerous.  Stanley v. Commonwealth, 16 Va. App. 873, 875, 433 S.E.2d 512, 514 (1993) (citing Michigan v. Long, 463 U.S. 1032, 1049-50 (1983)).[2]

Further, actions by an individual prior to a seizure "may both crystallize previously unconfirmed suspicions of criminal activity and give rise to legitimate concerns for officer safety," thereby permitting detention and a limited search for weapons.  Jones, 52 Va. App. at 562, 665 S.E.2d at 268 (quoting United States v. Davis, 202 F.3d 1060, 1063 (8th Cir. 2002)).  Additionally, under some circumstances, reasonable articulable suspicion that an individual possesses a *concealed* weapon "*ipso facto* render[s] him potentially armed and dangerous" for purposes of permitting both a detention and a limited weapons search.  Id. at 560-61, 665 S.E.2d at 267.  See also Jones v. Commonwealth, 272 Va. 692, 701 n.3, 636 S.E.2d 403, 407 n.3 (2006) ("[I]t is reasonable for an officer to believe a person may be armed and dangerous when the person is suspected of being involved in a drug transaction[.]" (quoting United States v. Bustos-Torres, 396 F.3d 935, 943 (8th Cir. 2005))).

_____

[2] We note that the United States Supreme Court's holding in Arizona v. Gant, 556 U.S. 332, 346-47 (2009) concerning the scope of vehicle searches incident to arrest, did not affect the ongoing validity of the Long exception permitting a vehicle search based on officer safety concerns.

In light of these principles, we find that Detectives Hunter and Whitson had reasonable articulable suspicion that appellant possessed a concealed weapon and was armed and dangerous, justifying appellant's seizure and subsequent protective search of his vehicle. While mere presence in a high crime area does not establish a reason to detain a suspect, "it is a relevant contextual consideration in a Terry analysis." Whitaker v. Commonwealth, 279 Va. 268, 276, 687 S.E.2d 733, 737 (2010); see also Walker v. Commonwealth, 42 Va. App. 782, 791-92, 595 S.E.2d 30, 35 (2004) (finding defendant's behavior and "very nervous" appearance in area known for drug activity, and officer's concern when appellant refused to remove hand from his pocket, justified frisk). Appellant's presence in a "high-drug, high crime area" was one of several contextual considerations supporting the detectives' actions. The experienced detectives were specifically "investigating some narcotics complaints" when they encountered appellant on a "secluded" part of the street "right [in front of the] area" where Detective Whitson previously had made several prior drug arrests. Detective Hunter had also "been [to] several places in that area . . . about drug sales." Based on his experience, Detective Hunter testified that drug dealers often wait for their clients in secluded locations; adding to his suspicions that appellant was engaged in narcotics activity.

We have held that a defendant's furtive hand gesture in a public place known for narcotics activity is a circumstance which, in and of itself, is insufficient to justify a Terry stop. Smith v. Commonwealth, 12 Va. App. 1100, 407 S.E.2d 49 (1991); Riley v. Commonwealth, 13 Va. App. 494, 412 S.E.2d 724 (1992). In Smith, a police officer observed the defendant, who was on foot, at night in a playground known for drug activity. Id. at 1102, 407 S.E.2d at 51. As the officer's marked patrol car approached, the defendant quickly thrust his hand into his pants. Id. The officer stopped, approached the defendant, and tried to search him. Id. As the two men tussled, the officer grabbed at the defendant's pants and pulled them open, finding a bag of cocaine. Id. We held that "[t]he officer's observations, standing alone, were not sufficient to justify an investigatory stop and

search." Id. at 1104, 407 S.E.2d at 52. Similarly, in Riley, we held that a police officer's observations of a defendant walking away from his car in a high-crime area at night, and making a motion toward his waistband, did not amount to a reasonable articulable suspicion. Riley, 13 Va. App. at 497-99, 412 S.E.2d at 726-27.

Unlike the defendants in Smith and Riley, appellant did not merely exhibit a single furtive movement in a high crime area. Instead, numerous factors prompted the investigative detention and subsequent search of the area where appellant was reaching. The detectives were responding to specific complaints of narcotics activity and had personal experience making drug arrests in the immediate vicinity. Appellant was sitting motionless when the detectives first observed him, and then changed his behavior significantly when he saw them approach in their unmarked car. He engaged in "a bunch of movements inside of [his] vehicle," looking "up and down" repeatedly. When the detectives parked and walked towards him, appellant immediately turned away and began reaching repeatedly next to his seat, which prompted the detectives to demand that he show both hands. He "dug down into the seats," "tuck[ing] his right hand into the rear bottom of the driver's seat," and he refused to show his hands despite being told to do so "at least ten times."

Our decision in Jones, 52 Va. App. 548, 665 S.E.2d 261, where we affirmed the denial of a suppression motion, is instructive. In Jones, detectives approached the defendant who was in a vehicle parked outside a hotel known for narcotics transactions. Id. at 552-53, 665 S.E.2d at 263. Prior to their approach, the detectives had observed the defendant sitting in his car and looking down toward his lap for about fifteen minutes. Id. at 552, 665 S.E.2d at 263. The detectives believed Jones could be involved in a narcotics transaction, although he was not engaged in any overtly criminal activity. Id. at 552-53, 665 S.E.2d at 263. As the detectives began speaking to him, Jones reached for the floorboard of his vehicle. Id. at 553, 665 S.E.2d at 263. He ignored the detectives' command to put his hands on the steering wheel and persisted in reaching down

- 9 -

underneath the seat.  Id.  The detective on the passenger side of the car noticed a large bowie knife behind the seat.  Id. at 553-54, 665 S.E.2d at 264.  Jones again ignored the detectives' commands and continued "going down underneath the seat."  Id. at 554, 665 S.E.2d at 264.  Jones then exited the car, holding a black zippered bag that he tossed onto the driver's seat.  Id.  The detectives seized Jones and the bag, which contained drugs and a digital scale.  Id.  One of the detectives testified that as the defendant was reaching to the floorboard and ignoring his commands, "[m]y concern was that I was going to get shot."  Id. at 553, 665 S.E.2d at 264.

We held that Jones was not seized until he stepped out of the vehicle because he did not submit to the detectives' authority until then.  Id. at 557, 665 S.E.2d at 265-66.  We further held that when the detectives seized Jones, they had reasonable articulable suspicion both that he possessed a weapon and that he was armed and dangerous.  Id. at 560-64, 665 S.E.2d at 267-69.  The Court's analysis focused on Jones's failure to obey the detectives' commands to show his hands and his continual reaching under the seat.  We specified that "[t]he potential concealed weapon to which we here refer is not the bowie knife . . . [but] the black bag, which Jones retrieved from 'underneath' the car seat, despite being thrice told not to reach under that seat."  Id. at 561, 665 S.E.2d at 267.  We found that Jones' continued disregard of the detectives' commands, coupled with his repeated attempts to reach toward the floorboards, gave rise to a reasonable suspicion that warranted the seizure.  Id. at 560-61, 665 S.E.2d at 267; see also James v. Commonwealth, 22 Va. App. 740, 745-46, 473 S.E.2d 90, 92 (1996) (concluding that a frisk was constitutionally permissible where a passenger exhibited "jittery" behavior and was unresponsive to officers' requests to keep hands in view during a driver's arrest).

Similarly, here, based on their initial observations of appellant, and their knowledge of and personal experience in the area, the detectives suspected that appellant was involved in narcotics activity.  As in Jones, the officers did not immediately see appellant engage in any overtly criminal

behavior. The detectives initially observed appellant make "a bunch of movement inside of his vehicle" by "looking up and down." Upon their approach, the detectives saw appellant look in their direction and start moving around in his vehicle. The detectives repeatedly told appellant to show them his hands. Despite being instructed at least *ten* times to put both hands on the steering wheel, appellant continued to "d[i]g down" next to his seat, with his right hand out of view. Detective Hunter testified that he thought appellant had a concealed firearm, based on the way he was acting. This concern was objectively reasonable, given the detectives' familiarity with the prevalence of narcotics transactions in that location, appellant's initial furtive movements, and most significantly, appellant's refusal to respond to the detectives' repeated commands to show his hands, which were based on their concern for their own safety. See Harris v. Commonwealth, 241 Va. 146, 149, 400 S.E.2d 191, 193 (1991) (stating that, in determining whether an officer has reasonable articulable suspicion, "due weight must be given . . . to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience" (quoting Terry, 392 U.S. at 27)).

The interest in police officer safety was an important consideration in the United States Supreme Court's decision in Terry:

> We are now concerned with more than the government interest in investigating crime; in addition, there is the more immediate interest of the police officer in taking steps to assure himself that the person with whom he is dealing is not armed with a weapon that could unexpectedly and fatally be used against him. Certainly it would be unreasonable to require that police officers take unnecessary risks in the performance of their duties. American criminals have a long tradition of armed violence, and every year in this country many law enforcement officers are killed in the line of duty, and thousands more are wounded.

Terry, 392 U.S. at 23. This justification for an investigative search set forth in 1968 by the United States Supreme Court holds firm today.

By the time appellant was seized for purposes of the Fourth Amendment, which did not occur until appellant was physically removed from the car, the detectives had reasonable articulable

- 11 -

suspicion that appellant was involved in criminal activity. Therefore, the investigatory detention, and the search under the rear portion of appellant's driver's seat, did not violate the Fourth Amendment.

CONCLUSION

For the foregoing reasons, we find that the court did not err in denying appellant's motion to suppress.

Affirmed.

Humphreys, J., dissenting.

The First, Fourth, Fifth, and Sixth Amendments to the Constitution of the United States find their origin in the Virginia Declaration of Rights of 1776. The Fourth Amendment's parallel protections against warrantless searches and seizures have been enshrined in every Virginia constitution since, currently appearing as Article 1, Section 10 of the Constitution of 1971.[3] Therefore, I find it sadly ironic that the shield the Fourth Amendment once provided from warrantless governmental intrusions for the innocent and guilty alike, has been diluted here in the place of its birth to the point that the majority today can seriously conclude that it provides no protection for a citizen, legally parked on a city street at 2:30 in the afternoon, who is dragged from his car for failing to follow police "commands" that he had no legal obligation to obey and then handcuffed while his vehicle is searched—all based upon his presence in what is only generally described as a "high crime, drug area" and on what even an officer involved described as a "hunch" that he might be involved in drug activity. Because I disagree with both the analysis and judgment of the majority, I respectfully dissent.

### A. Whether Hill was Properly Seized under the Fourth Amendment

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. To constitute a seizure for Fourth Amendment purposes, an individual must either be physically restrained or submit to a show of governmental authority. Ford v. City of Newport News, 23

---

[3] "The Virginia Declaration of Rights was the first true Bill of Rights in the modern American sense, since it is the first protection for the rights of the individual contained in a Constitution adopted by the people acting through an elected convention . . . . [I]ts importance as the source of the federal Bill of Rights may not be overemphasized . . . . Every specific guarantee in the Virginia proposal, save one, later found a place in the federal Bill of Rights which was introduced in the first Congress by Madison as proposed by Virginia herself." United States v. Payne, 492 F.2d 449, 459-60 (4th Cir. 1974) (Widener, J., concurring and dissenting).

Va. App. 137, 142, 474 S.E.2d 848, 850 (1996) (citing California v. Hodari D., 499 U.S. 621 (1991)).

Since Terry v. Ohio, 392 U.S. 1 (1968), Fourth Amendment jurisprudence has allowed "brief, investigatory stop[s] when the officer has a reasonable, articulable suspicion that criminal activity is afoot." Bass v. Commonwealth, 259 Va. 470, 474-75, 525 S.E.2d 921, 923 (2000) (quoting Terry, 392 U.S. at 30). In reviewing whether there is reasonable suspicion supporting such Terry seizures, the court "must view the totality of the circumstances and view those facts objectively through the eyes of a reasonable police officer with the knowledge, training, and experience of the investigating officer." Murphy v. Commonwealth, 9 Va. App. 139, 144, 384 S.E.2d 125, 128 (1989). However, a mere inchoate suspicion or "hunch" is insufficient to establish reasonable suspicion for the purposes of Terry. See United States v. Sokolow, 490 U.S. 1 (1989).

The majority synthesizes the testimony of the lead officer, Detective Hunter, as follows: "based on the character of the location and his experience with drug dealers waiting for their clients in 'a secluded area,' [Detective Hunter] was investigating possible narcotics activity." With all due respect to my colleagues, they overstate the Commonwealth's evidence. The encounter here occurred at 2:30 in the afternoon in a Portsmouth residential neighborhood, where Hill was legally parked. The entirety of Detective Hunter's direct examination concerning the reason he and Detective Whitson approached Hill is as follows:

> [M]yself and Detective Whitson were patrolling the area of the 600 block of Newport Avenue in the City of Portsmouth, which is a high crime, drug area, at which time we drove by Newport Avenue and we seen [sic] the Defendant in a black four door Lexus bearing Virginia tags VGP1307, and he was leaning back inside of the vehicle. We went down to Newport Avenue and made a U-turn and came back up to the intersection and approached the subject in the vehicle.

Upon approaching Hill's vehicle, Detective Hunter added only the following testimony as the basis for seizing Hill and dragging him from his vehicle:

- 14 -

As we pulled up on the vehicle, we observed the subject, Mr. Patrick [sic] to my left. He kept looking up and down, up and down, and he was constantly doing a bunch of movement inside of the vehicle, at which time we did park the vehicle and get out on foot to make contact. We approached the subject on the driver's side of the vehicle, at which time when we approached the subject, he put his left hand on the steering wheel and then he turned his back. When he turned his back and head away from us, he began digging with his right hand between – [interruption by the circuit court with a request to slow down] - the left hand on the steering wheel; he turned his back and head away from us. With his right hand, he began to dig down between the driver's seat, so at which time we gave him several commands, "Show us your hands, show us your hands," and he continued to disobey our orders, at which time we opened the driver's side door and I grabbed the subject by his left forearm in an attempt to give him commands to show me your hands, show me your hands, and he continued to pull away and dig down between the seats. The subject had a strong grip on the steering wheel. It was hard to get his forearm off. Finally, when he was removed from the vehicle, he was detained by Detective Whitson.

After testifying to the above on direct examination, Detective Hunter on cross-examination admitted that the "sum total of why [he] approached [Hill's] vehicle" was "that he was parked in a high crime area." When asked if he could articulate any crime he thought Hill was committing, Detective Hunter responded "No." When asked why he instructed Hill to "show his hands," Detective Hunter responded, "I had no idea what he was reaching for." When asked on cross-examination if it was fair to say that he "just had a hunch," Detective Hunter responded "Correct." When asked what crime Detective Hunter believed Hill was committing when he grabbed him, Detective Hunter replied that he was "just investigating." When asked *what* he was investigating, Detective Hunter replied "[c]ould have been, you know, narcotics." On re-direct examination Detective Hunter testified that he told Hill after he was handcuffed that he thought he may have been reaching for a firearm.

Similarly, Detective Whitson testified and agreed with the prosecutor that he and Detective Hunter approached Hill's vehicle because of his presence in a "high crime, drug area" without

providing any specifics or details that would support such a conclusion and that he had made "several" drug arrests, "mostly right behind that area" again without any specifics regarding the quantity or nature of the drugs involved or the period of time over which these arrests were made. When asked about Hill's seizure, Detective Whitson testified that he could not clearly see Hill's right hand as he was seated in his car and after "about ten" commands to "show me your hands," Hill was "forcibly removed." On cross-examination, Detective Whitson agreed that he never observed Hill do anything illegal prior to his seizure and that he didn't know what Hill might have been reaching for.

Despite Detective Hunter's testimony agreeing that he "just had a hunch," the majority holds that the detectives nevertheless articulated sufficient facts and circumstances amounting to reasonable suspicion of criminal activity. The majority relies upon two decisions of this Court it asserts are analogous: Jones v. Commonwealth, 52 Va. App. 548, 665 S.E.2d 261 (2008), and Beasley v. Commonwealth, 60 Va. App. 381, 728 S.E.2d 499 (2012).

In considering any application of *the Fourth Amendment* to this case, I first note that Hill was certainly not free to leave from the moment the detectives forcibly removed him from his vehicle and thus, whether the facts articulated by the detectives constitute either reasonable suspicion for an investigative detention or probable cause for an arrest must be assessed from prior to that point.

Thus, pursuant to Terry and its progeny, what is at issue in this appeal is simply whether the totality of the circumstances, as articulated by Detectives Hunter and Whitson, amount to a reasonable suspicion that a crime had been committed, was in progress, or was about to be committed at the moment Hill was seized and dragged from his car. In that respect, both Jones and Beasley are quite distinct from the present case.

- 16 -

In comparison to the record before us here, the police officers in both Jones and Beasley articulated far more detailed specific facts and circumstances supporting reasons to suspect criminal activity. For example, in Jones, two officers approached while Jones sat in his car at a motel known for drug trafficking. Unlike here, where no such information was provided, the officers in Jones provided details supporting that assertion, including the description of a recent arrest in the very same location in which "several kilos of cocaine" were recovered within the preceding two weeks. Jones, 52 Va. App. at 552, 665 S.E.2d at 263. While one officer conversed with Jones, another officer noticed a large bowie knife in the car within reach of Jones. As the first officer spoke to him, Jones repeatedly reached toward the floorboard of his car, causing the officer to *ask* Jones to keep his hands on the steering wheel. Jones temporarily complied but then continued to reach down out of the officer's sight, and the officer repeated his request, explaining that if Jones kept reaching down, he would assume he was reaching for a gun. When Jones began to reach down a third time, his actions prompted the officers to order Jones out of the vehicle in order to secure the knife and any other weapon. Instead of complying, Jones reached under his seat a third time, causing the first officer to draw his weapon. Jones withdrew a long black object, exited the car, and dropped the black object. On inspection, the object was discovered to be a bag containing a portable scale and various illegal drugs. This Court held that Jones was not seized until he exited the car and that, at that point, the officers had a reasonable articulable suspicion that Jones had a concealed weapon, referring to the black bag. Jones, 52 Va. App. at 560-61, 665 S.E.2d at 267.

In the present case, the "suspicion" of either criminal activity or the possible existence of a concealed weapon lacks a similar empirical foundation. In a scenario like Jones, when the occupant of a vehicle, parked in the precise location late at night when and where major drug transactions routinely take place, is clearly in possession of one weapon, is specifically told that if he continues to reach down where his hands cannot be seen, the officer will assume he is reaching for a weapon,

and then that occupant reaches down and produces a second suspicious object from a hidden place, it is reasonable for the officers to conclude that second object is also a weapon that was previously concealed – a crime unless one has a permit. In contrast here, there was no testimony regarding specific facts and circumstances that would lead a reasonable police officer to conclude that an occupied vehicle legally parked in this particular residential area at 2:30 in the afternoon was indicative of criminal activity other than a general characterization of the location as a "high crime, drug area," nor does this record contain any testimony from the officers explaining why Hill's "bunch of movement" within his vehicle necessarily supported a reasonable conclusion that he was committing a crime or possessed a weapon. While Detectives Hunter and Whitson had every right to approach Hill's vehicle and attempt to converse with him about his business there, his mere presence there at that hour even when coupled with Hill's actions in the vehicle, without more of an explanation of the significance of Hill's presence at that location and time of day to specific criminal activity such as would lead a trained and objective police officer to a conclusion that criminal activity is afoot, were insufficient to support a seizure or detention of Hill. The addition of the only other factor mentioned by the detectives - that Hill failed to obey repeated commands to show his hands does not alter that conclusion since, unlike the situation in <u>Jones</u>, when Hill was ultimately seized, the detectives had seen nothing that reasonably suggested that Hill was armed.

If failure to obey the command of a police officer during a consensual encounter in a "high crime" area is now the test for "reasonable suspicion" of criminal activity, the encounter is not consensual at all and our oft repeated observation that these encounters are by definition consensual because citizens can ignore the officer and just walk away is as much a legal fiction as most citizens believe it to be. See <u>e.g.</u> <u>Matthews v. Commonwealth</u>, 65 Va. App. 334, 342, 778 S.E.2d 122, 126 (2015) ("police officers may engage in consensual encounters with citizens, so long as such

- 18 -

encounters are those in which a reasonable person would feel free 'to disregard the police and go about his business'" (quoting Hodari D., 499 U.S. at 628.)

The mere fact that Hill ignored commands to show his hands - commands that he was under no obligation to obey - does not reasonably suggest that he was armed. Even if it were the case, without more, such suggestion would not be enough to justify Hill's seizure since possessing a weapon is not inherently a criminal act. Nor was there any testimony beyond the sheerest speculation that, at the time the officers shouted their commands to show his hands, Hill was engaged in any sort of criminal activity.

Beasley is equally unsupportive of the majority's analysis. An officer observed a van containing Beasley and a companion at 3:30 a.m., parked in an area "noted for drug activity, gun violence and homicides," and clearly marked with a "No Trespassing" sign. The officer also observed a third person approaching the van on foot. When the officer saw the van again a few minutes later it now contained three people. The officer approached the van, and, as he did so, noticed Beasley reach under his shirt, while another passenger in the van simultaneously reached towards the side of his seat. Beasley, 60 Va. App. at 387, 728 S.E.2d at 502. The officer testified that in his "extensive experience" the late hour, location, and the specific "furtive movements" of both passengers made the officer fear that one or more of the occupants were reaching for a weapon, and he directed them to place their hands in their laps. Id. The officer had to repeat this order multiple times as Beasley would initially comply with each request and then later begin removing his hands from his lap. Id. at 388, 728 S.E.2d at 502. This Court held that the consensual encounter ended and Beasley was seized when he finally submitted to the officer's instruction to keep his hands on his lap. Id. at 394, 728 S.E.2d at 505. The Beasley Court held that, at that moment, reasonable suspicion of criminal activity already existed justifying the detention of Beasley because the confluence and *totality* of the factors articulated by the officers that indicated reasonable

suspicion of criminal activity on Beasley's part:  that the encounter involved a vehicle containing three people at 3:30 a.m.; Beasley apparently trespassing in an area clearly posted "No Trespassing" and known for both drug sales and gun violence; police observation of a third person approaching the van on foot at that late hour; the simultaneous "furtive" movements of the occupants within the van, specifically the continued movements of Beasley's hands while he was being questioned before he was seized; the fact that Beasley began to reach under his shirt in a manner consistent with the presence of a weapon as an officer approached and that also Beasley appeared to be attempting to discard an object out of the window; and finally, the testimony of the officer as to what all of those circumstances signified based on his training and experience Id. at 395-97, 728 S.E.2d at 506-07.

In Beasley, as in Jones, and unlike the case here, the police officers provided *detailed* testimony regarding the location and circumstances surrounding the vehicle and its occupants *prior* to their seizure which, in totality, supported suspicions that the occupants may be involved in criminal activity.  Instructively, the Beasley Court carefully differentiated that case from prior decisions of this Court but did not and could not overrule them.  If anything, Beasley and Jones demonstrate and reinforce the principle that it is truly the *totality* of the circumstances which collectively must amount to an objective reason for a police officer to suspect criminal activity.

In my view, the facts of this case have more in common with several other decisions of this Court rejected by the majority.  In Riley v. Commonwealth, 13 Va. App. 494, 412 S.E.2d 724 (1992), we reversed a narcotics conviction where the only circumstances articulated were that the suspect was in a "high crime area" and reached toward his waistband.  Likewise, in Smith v. Commonwealth, 12 Va. App. 1100, 407 S.E.2d 49 (1991), we reversed a narcotics conviction where the totality of the circumstances was that the defendant was in an area "known for drug activity" and the officer saw "the defendant quickly move to put his hand into his pants when the officer's marked car came into view."  Smith, 12 Va. App. at 1104, 407 S.E.2d at 52.  Finally, we reversed a

narcotics and firearm conviction in <u>Goodwin v. Commonwealth</u>, 11 Va. App. 363, 398 S.E.2d 690 (1990), where the facts articulated were simply that defendant "jammed" his hand into his coat pocket upon seeing officers.

In contrast to these cases, this Court in <u>Beasley</u> noted that "the facts [in <u>Beasley</u>] point to far more than a quick, furtive gesture in the presence of the police officer that gave the officer no more than a hunch of criminal activity." <u>Beasley</u>, 60 Va. App. at 397, 728 S.E.2d at 507. However, the facts in the present case fit this description quite well.

Our jurisprudence is clear that when the facts articulated in the record are nothing more than a furtive hand motion in a "high crime area," these bare facts are insufficient to meet the reasonable, articulable suspicion standard. In this case, I disagree with the majority that the testimony at the suppression hearing supported anything more than the "hunch" Detective Hunter admitted he and his partner were acting on.

Even in the light most favorable to the Commonwealth, the totality of the circumstances that the majority holds support a reasonable suspicion of criminal activity on Hill's part are that he was "doing a bunch of movement" and reaching down between the seats of his vehicle as he was legally parked in a high crime, drug area in the middle of the afternoon and refused multiple commands by the police to show his hands. While apparently it is of no moment to the majority, my concern is that what is lacking in this record is any testimony regarding why those facts, in their aggregate, should lead any objective police officer to the reasonable conclusion that Hill was committing, or about to commit, a crime.

Without more detailed testimony regarding the number and nature of criminal activity occurring at a given location over a recent period of time and the significance of those and other facts as part of the calculus that leads a police officer to a reasonable conclusion that a citizen should be detained to investigate whether they are involved in similar criminal activity, the subjective and

general characterization of the location that we have in this case, is unhelpful to the point of uselessness to trial and appellate courts in our constitutional review of the existence of reasonable suspicion.

Moreover, while it may be prudent to do so, unless and until they have been arrested or properly detained pursuant to Terry, citizens are not obligated to honor requests or even demands made upon them by police officers. While refusing to comply with a police officer's reasonable request may be a circumstance that, along with others, in totality may amount to reasonable suspicion of criminal activity, without more, such refusal cannot justify a seizure.

In both Jones and Beasley, the failure to obey the officers to show their hands was only one of many circumstances and in neither case, were dispositive of the existence of reasonable suspicion of criminal activity. For example, in Beasley, the late hour and his presence in an area noted for both drug sales and gun violence that was clearly marked "No Trespassing," the approach on foot of a third person who entered the van supported a reasonable suspicion of trespassing, a drug sale or both even before the officers approached Beasley. The fact that the officers chose to initially treat the encounter as consensual and not immediately detain Beasley and his companions for investigation does not alter the fact that they could have done so consistent with Terry. The simultaneous and similar actions by Beasley and his companion that, in their totality, gave rise to a suspicion on the part of police that Beasley and his companion were armed were additional circumstances supporting reasonable suspicion but not dispositive to the analysis. A similar conclusion flows from an examination of the facts in Jones. By contrast, in this case it is only Hill's refusal to comply with police demands coupled with the characterization of the location of Hill's parking spot as a "high crime, drug area" that the Commonwealth and the majority can point to in support of reasonable suspicion of criminal activity.

The safety of police officers when they are investigating possible criminal activity is certainly a valid consideration in any Terry analysis with respect to a "frisk" or pat down, but when, as here, there is no testimony whatever in the record to suggest both criminal activity *and* the presence of a weapon, as was the case in both Jones and Beasley, mere failure to follow "commands" motivated solely by officer safety considerations during what the Commonwealth argues was allegedly a consensual encounter, without more facts and circumstances to support criminal activity than are present in this record, is not a proper basis to support the forcible seizure of a citizen. Moreover, "[e]ven in high crime areas, where the possibility that any given individual is armed is significant, Terry requires reasonable, individualized suspicion before a frisk for weapons can be conducted." McCain v. Commonwealth, 275 Va. 546, 554, 659 S.E.2d 512, 517 (2008) (quoting Maryland v. Buie, 494 U.S. 325, 334 n.2 (1990)).

Facts and circumstances may accumulate during a consensual encounter until their totality amounts to reasonable suspicion of criminal activity, but reasonable suspicion cannot spring forth fully formed from the gut instincts or vague suspicions of a police officer.

Likewise, if the detectives suspected that Hill had a weapon, and therefore "frisked" him and his vehicle to protect themselves, they need to "be able to point to *particular* facts from which [they] reasonably inferred that the individual was armed and dangerous." Sibron v. New York, 392 U.S. 40, 64 (1968) (emphasis added). The record is deficient on this point as well.

Good police work often involves acting on a "hunch" but constitutional considerations limit how far police officers can go about confirming such "hunches." Experienced and competent police officers often observe things that, based upon their extensive training and experience, don't quite add up but do not rise to the level of reasonable suspicion far less probable cause. Detectives Hunter and Whitson were refreshingly honest in their testimony that, in effect they had a "hunch" that Hill's presence on that afternoon warranted further inquiry. They had every right to approach

Hill and attempt to engage him in conversation concerning his presence there just as Hill had an equal right to ignore them or just drive away if he so chose. Had the detectives done so, they may well have developed sufficient facts that rose higher than their "hunch" and justified briefly detaining Hill for further investigation consistent with the holding of Terry and its progeny, as the officers involved in the Brown and Beasley cases did. The fact that Detectives Hunter and Whitson elected not to do so and instead seize Hill when they did is not a reason for this Court to lower the constitutional bar required to justify the supposedly narrow exception to the probable cause requirement of the Fourth Amendment pursuant to Terry.

### B. The Search of the Vehicle

As the Supreme Court of the United States reiterated in Arizona v. Gant, 556 U.S. 332, 346-47 (2009), "Michigan v. Long, 463 U.S. 1032 (1983), permits an officer to search a vehicle's passenger compartment [only] 'when he has reasonable suspicion that an individual . . . is "dangerous" and *might access the vehicle to 'gain immediate control of weapons*.' Id., at 1049 (quoting Terry v. Ohio, 392 U.S. 1, 21 (1968))." Although Hill also challenges the search of his vehicle, in addition to his detention, he does not raise any issue with respect to the application of Long to this case and I agree with the majority that we need not consider the search of the vehicle beyond whether it improperly resulted from a lack of reasonable suspicion to detain Hill in the first place.

### C. Conclusion

In my view, with today's decision, this Court has given license to police officers to detain anyone who refuses to comply with any order given during a "consensual" encounter so long as it takes place in a "high crime area," which now seems to be the approximate area where any crime has ever occurred. Because such latitude in police-citizen encounters is wholly incompatible with Fourth Amendment jurisprudence from the United States Supreme Court and, prior to today, from

this Court, I dissent from the analysis and judgment of my colleagues.  Instead, I would hold that the evidence, even in the light most favorable to the Commonwealth, supports no more than the "hunch" Detective Hunter testified that he and Detective Whitson were acting on and is insufficient as a matter of law to constitute reasonable suspicion of criminal activity.  Therefore, I would reverse the judgment of the circuit court in this case for the reasons stated and remand for a new trial if the Commonwealth is so advised.