COURT OF APPEALS OF VIRGINIA

Present: Judges Beales, Huff and Chaney
Argued at Norfolk, Virginia


KALEN TERRELL FEAGINS

MEMORANDUM OPINION* BY
v.      Record No. 1241-22-1      JUDGE RANDOLPH A. BEALES
                                  OCTOBER 17, 2023
COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF THE CITY OF NEWPORT NEWS
Bryant L. Sugg, Judge

Charles E. Haden for appellant.

David A. Mick, Assistant Attorney General (Jason S. Miyares,
Attorney General, on brief), for appellee.


Pursuant to a plea agreement, Kalen Terrell Feagins entered a conditional guilty plea to one

count of possession of a Schedule I controlled substance and one count of possession of a firearm

while in possession of a Schedule I or II controlled substance.  On appeal, Feagins argues that the

"trial court erred in denying Feagins' motion to suppress" and "asks that this Court reverse the

judgment of the trial court."

## I. BACKGROUND

"In accordance with familiar principles of appellate review, the facts will be stated in the

light most favorable to the Commonwealth, [as] the prevailing party at trial."  *Scott v.*

*Commonwealth*, 292 Va. 380, 381 (2016).  As the Supreme Court has stated, "This principle

requires us to 'discard the evidence of the accused in conflict with that of the Commonwealth,

and regard as true all the credible evidence favorable to the Commonwealth and all fair

* This opinion is not designated for publication.  *See* Code § 17.1-413(A).

inferences to be drawn therefrom.'" *Kelley v. Commonwealth*, 289 Va. 463, 467-68 (2015)

(quoting *Parks v. Commonwealth*, 221 Va. 492, 498 (1980)).

On the evening of March 4, 2021, Newport News police officers Christopher Muhich and

Sergeant Frank Vito were patrolling an apartment complex. The officers were in uniform and

were driving a marked police car. The apartment complex was in a high-crime area, and the

officers were members of a High Impact Patrol unit – a police unit that is designed to be

proactive and to address crime trends. During this patrol, the officers saw an individual, later

identified as Feagins, sitting in a vehicle that was running and that was backed into a parking

space in the apartment complex. As Officer Muhich later testified at the suppression hearing,

there had been "a lot of stolen vehicles" in the area and the officers wanted "[t]o see if [Feagins]

had any information . . . regarding those types of crimes." Both officers wore body-worn

cameras which recorded video footage of their encounter with Feagins.

Sergeant Vito stopped the police car approximately "one-and-a-half to two spaces back"

away from Feagins's vehicle. The parked police car did not obstruct Feagins's ability to drive

away. Footage from both officers' body-worn cameras show that Officer Muhich approached

the driver's side of Feagins's vehicle while Sergeant Vito went to the passenger side. Sergeant

Vito shined his flashlight on the vehicle. The police car's headlights and the white lights on its

light bar, which the officers referred to at the suppression hearing as "takedown lights," were

illuminating the vehicles in the parking lot. No emergency lights or sirens were activated.

As Officer Muhich approached, Feagins lowered his driver's side window part of the way

down. Officer Muhich began a conversation with Feagins, asking, "What's going on, man?" to

which Feagins replied, "What's up?" Officer Muhich asked if Feagins was "just out here

chilling," whether he was "waiting on somebody," and whether he lived in the area and was

waiting for his friend. Feagins responded "Yeah" to each question. When Officer Muhich asked Feagins where his friend was, Feagins responded that his friend "live[d] out here."

Officer Muhich then explained why he and Sergeant Vito were in the parking lot, stating, "We just have a lot of problems with stolen vehicles and everything like that so we just coming out here to check the parking lots and everything." Feagins responded, "Okay." Then, Officer Muhich asked, "You got your ID on you?" and "You mind if I see it?" Feagins asked what the problem was, and Officer Muhich then explained, "No uh, no problem, just like, we're out, like I said, we're out here IDing people that ain't from around the area. That's all." After this statement, Feagins pulled out his driver's license, held it out from his driver's side window, and then handed it to Officer Muhich. Officer Muhich took hold of Feagins's license and said, "Appreciate it." Officer Muhich then stood next to Feagins's window while he read the license.

During this conversation, Sergeant Vito had been standing by the passenger side of Feagins's vehicle. Sergeant Vito was using his flashlight to illuminate the vehicle as he looked through the glass of a closed window, and he was repeatedly shining his flashlight at something on Feagins's dashboard. Sergeant Vito testified that the object was a clear plastic baggie that appeared to be either knotted or bunched up. Sergeant Vito then began walking in front of the vehicle to join his partner, Officer Muhich, just as Officer Muhich was given Feagins's driver's license. Upon reading the license, Officer Muhich stated, "Alabama? How long you live here?" Feagins then turned to look at Sergeant Vito, as he was walking across the front of Feagins's vehicle with his flashlight now turned off. At that moment, Feagins reached toward the center of his dashboard and grabbed hold of the plastic baggie with his right hand while stating that he had lived in the area "[f]or a while now." When Feagins grabbed the baggie, the total time that had elapsed from when the officers first spoke to Feagins until Feagins grabbed the baggie was less

than one minute. As demonstrated by the officers' body-worn camera footage, Officer Muhich had also only held Feagins's license for a total of six seconds when Feagins grabbed the baggie.

When Sergeant Vito saw Feagins grab the baggie, he shone his flashlight on Feagins, and asked, "Anything in the bag you just grabbed?" Feagins answered, "Yeah," while holding the baggie inside his closed fist in his right hand. Sergeant Vito asked, "What's in it?" Feagins responded, "Medication." Officer Muhich asked, "What kind?" as Sergeant Vito said, "Medication, you mind if I see it?" Feagins responded, "Yeah, is there a problem though?" Sergeant Vito then said, "Well yeah, because right now it looks like you got something in the bag that we need to see, man."

Feagins then asked, "I mean, well what am I doing wrong here now?" Sergeant Vito said, "Well right now you got some, some pills in your hand there, right? Or some powder or something?" Feagins responded, "No, it's not powder," to which Sergeant Vito responded, "Just the pills?" and "It ain't cocaine?" Feagins confirmed that it was just pills and not cocaine, which prompted Sergeant Vito to ask, "Mind if I see it real quick?" Feagins answered, "Yeah I do though, because it's not mine." Sergeant Vito then said, "Oh, okay. Perfect." Sergeant Vito tried unsuccessfully to open the door and then stated, "Alright, go ahead and open the door for me." Feagins then handed over the plastic baggie to Sergeant Vito through his open window. Officer Muhich then told Feagins to "[g]o ahead and shut the car off, man."

Feagins complied with the officers' instructions and got out of the vehicle. Officer Muhich began a pat down of Feagins, and Feagins stated that he had a firearm, which Officer Muhich recovered from Feagins's waistband. Feagins was then handcuffed while he was detained. The plastic baggie recovered from Feagins contained pills that were ultimately determined to contain Clonazolam, a Schedule I controlled substance.

Feagins filed a pretrial motion to suppress "any and all evidence seized as a result" of his encounter with the police. After the trial court denied his motion to suppress in a detailed, nine-page order, Feagins entered a conditional guilty plea to possessing a Schedule I controlled substance and to simultaneously possessing a controlled substance and a firearm. By final order entered July 7, 2022, the Circuit Court of the City of Newport News sentenced Feagins to six years of incarceration with all time suspended. Feagins now appeals to this Court and contends that the trial court "erred in denying [his] motion to suppress."

## II. ANALYSIS

In reviewing a trial court's denial of a motion to suppress, "[t]he burden is on the defendant to show that the denial of his suppression motion, when the evidence is considered in the light most favorable to the Commonwealth, was reversible error." *McCain v. Commonwealth*, 261 Va. 483, 490 (2001) (citing *Fore v. Commonwealth*, 220 Va. 1007, 1010 (1980)). "We review de novo the trial court's application of the law to the particular facts of the case." *Branham v. Commonwealth*, 283 Va. 273, 279 (2012). Furthermore, we are "bound by the trial court's findings of historical fact unless 'plainly wrong' or without evidence to support them and we give due weight to the inferences drawn from those facts by resident judges and local law enforcement officers." *McGee v. Commonwealth*, 25 Va. App. 193, 198 (1997) (en banc) (quoting *Ornelas v. United States*, 517 U.S. 690, 699 (1996)).

Feagins's assignment of error on appeal invokes protections under the Fourth Amendment to the Constitution of the United States. That Amendment reads:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

A "cardinal principle" of the Fourth Amendment is that searches and seizures conducted without a warrant "are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *California v. Acevedo*, 500 U.S. 565, 580 (1991) (quoting *Mincey v. Arizona*, 437 U.S. 385, 390 (1978)). Relevant to the case now before us on appeal, one such exception to the warrant requirement was recognized in *Terry v. Ohio*, 392 U.S. 1 (1968), which held that an officer may briefly detain a suspect if he possesses reasonable, articulable suspicion that criminal activity may be afoot. In addition, the warrant requirement is not implicated at all during a citizen's consensual encounter with police, as such an encounter "will not trigger Fourth Amendment scrutiny unless it loses its consensual nature." *Florida v. Bostick*, 501 U.S. 429, 434 (1991). Consequently, we review whether Feagins's encounter with the police was consensual, whether consent was lost, and, if consent was lost, whether the officers possessed reasonable, articulable suspicion to briefly detain Feagins at that moment.

### A. Consent

On appeal to this Court, Feagins argues that he was seized after he handed his identification card to Officer Muhich because "Sergeant Vito and Officer Muhich accosted Feagins, demanded and retained his driver's license," and "afterwards demanded to see inside a plastic baggy that they observed inside Feagins' vehicle."

As the United States Supreme Court has stated, "Law enforcement officers do not violate the Fourth Amendment's prohibition of unreasonable seizures merely by approaching individuals on the street or in other public places and putting questions to them if they are willing to listen." *United States v. Drayton*, 536 U.S. 194, 200 (2002). Such consensual encounters between police officers and a citizen are not seizures as described in the Fourth Amendment, and such encounters do not violate the Fourth Amendment. *See Florida v. Rodriguez*, 469 U.S. 1, 5-6 (1984); *Jones v.*

*Commonwealth*, 279 Va. 521, 528 (2010). "Police officers are free to engage in consensual encounters with citizens, indeed, it is difficult to envision their ability to carry out their duties if that were not the case." *Malbrough v. Commonwealth*, 275 Va. 163, 169 (2008).

When a person encounters a police officer, the encounter becomes a seizure for Fourth Amendment purposes "only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall*, 446 U.S. 544, 554 (1980). The Supreme Court of Virginia has stated that "the number of police officers present, the display of weapons by an officer, physical contact between an officer and a citizen, an officer's language or tone of voice compelling compliance, the retention of documents requested by an officer, and whether a citizen was told that he or she was free to leave" are all relevant factors in determining whether a seizure occurred. *Jones*, 279 Va. at 528-29 (citing *Ohio v. Robinette*, 519 U.S. 33, 36 (1996)). In addition, "what constitutes a restraint on liberty prompting a person to conclude that he is not free to 'leave' will vary, not only with the particular police conduct at issue, but also with the setting in which the conduct occurs." *Michigan v. Chesternut*, 486 U.S. 567, 573 (1988).

In its letter opinion denying Feagins's motion to suppress, the trial court found that "[t]he demeanor of the conversation was not overly aggressive or ordering compliance by badge of law." The trial court also found that "[n]o orders were given stating Defendant was not free to leave" until after Feagins's furtive gesture of grabbing and concealing the knotted plastic baggie. In addition, the police car was not parked so as to block Feagins from leaving the parking lot, and Officer Muhich retained Feagins's license for just six seconds before Feagins's furtive gesture to grab the baggie gave rise to reasonable, articulable suspicion, which we address *infra* in Part II.B. Given the body-worn camera footage and the testimony of both Sergeant Vito and Officer Muhich, we cannot say that the trial court's factual findings are plainly wrong. *See* Code

§ 8.01-680. On these facts, the trial court ultimately determined that the encounter remained consensual until Sergeant Vito began to confront Feagins after Feagins reached for and concealed the plastic baggie.

The trial court correctly held that Feagins was not seized until this point under these circumstances. Two uniformed officers do not violate the Fourth Amendment by approaching a citizen in a parking lot and asking general questions in a conversational tone. *See Drayton*, 536 U.S. at 200; *see also Malbrough*, 275 Va. at 169-70. In addition, using white lights to illuminate the parking lot and flashlights to illuminate Feagins's vehicle does not constitute, by itself, a seizure under this Court's precedent. *See Beasley v. Commonwealth*, 60 Va. App. 381, 390-91 (2012) (holding that beaming a police vehicle's spotlight directly at a vehicle's occupants does not render the occupants seized).[1] Furthermore, no physical contact was made with Feagins that would communicate to him that he was seized, and he was not told that he was not free to leave. *See Jones*, 279 Va. at 528-29. Also, Officer Muhich's retention of the license for six seconds – before reasonable, articulable suspicion was established – as he looked at the driver's license and as he asked Feagins about the license did not transform these circumstances into a seizure. *See McCain*, 261 Va. at 487 (finding that no seizure occurred when a defendant's license was retained long enough to run his social security number and check for outstanding warrants). In short, uniformed officers are permitted to speak to an individual and ask questions if he is willing to listen, *Drayton*, 536 U.S. at 200, and that is what occurred here.

Indeed, under facts similar to those in this case, the Supreme Court of Virginia held that the encounter was consensual. *See McCain*, 261 Va. 483. In *McCain*, the police officer stopped

---

[1] While this Court has held that a citizen was seized when an officer hid himself "behind some bushes" and "jumped out and shined the flashlight" directly at a citizen who was walking down a street resulting in a "stunning effect" on that shocked person, *Moss v. Commonwealth*, 7 Va. App. 305, 307 (1988), this Court in *Moss* simply did not establish a rule that a citizen is seized whenever flashlights or spotlights are shined upon him.

behind the defendant and shone his police cruiser's headlights and spotlight onto the defendant's vehicle. *Id.* at 486. The officer in that case then requested McCain's ID, which he retained while he searched for outstanding warrants against McCain. *Id.*at 487. The Supreme Court held that this Court erred in finding that McCain was seized at that point. *Id.* at 490 ("[T]he Court of Appeals erred in concluding that Officer Thomas effected a seizure of McCain when he requested identification from McCain and conducted a check for outstanding warrants.").

In both *McCain* and the case now before us on appeal, the defendant was illuminated with a spotlight and a flashlight, was questioned by a police officer, and was requested to provide a form of identification that was then retained long enough to obtain basic information about the individual. *Id.* In *McCain*, the defendant encountered one officer and a second arrived later, while here two officers were present at the outset. *Id.* at 487. Although it is not clear for what length of time the defendant's license was retained in *McCain*, it was at least long enough to run McCain's information and check for outstanding warrants, while here Feagins's license was only retained for six seconds before reasonable, articulable suspicion developed. Furthermore, the officer's questioning of McCain was more demanding and less conversational than the questions Sergeant Vito and Officer Muhich asked Feagins. In *McCain*, the officer asked to search the vehicle, asked the occupants to exit the vehicle, and asked to pat down McCain.

Therefore, both the differences and the similarities between *McCain* and the facts here demonstrate that, based on binding precedent from the Supreme Court, the trial court was correct to determine that the encounter here was consensual until the officers developed reasonable, articulable suspicion to detain Feagins. *See id.*; *see also Jones*, 279 Va. at 528-29 (no seizure when defendant was asked to accompany officers to apartment rental office to determine if he was trespassing); *Montague v. Commonwealth*, 278 Va. 532, 539 (2009) (no seizure when

defendant was asked for identifying information while police stood five feet away from him and attempted to determine if defendant was barred from the premises).[2]

### B. Reasonable, Articulable Suspicion

At the time that Feagins was seized by the officers after Feagins grabbed and concealed a knotted plastic baggie, we must determine whether that seizure was supported by reasonable, articulable suspicion. *See Long v. Commonwealth*, 72 Va. App. 700, 712-13 (2021).

Under *Terry*, and its progeny, a police officer "may constitutionally conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." *Bass v. Commonwealth*, 259 Va. 470, 474-75 (2000) (citing *Terry*, 392 U.S. at 30). A reasonable, articulable suspicion requires only "some minimal level of objective justification" for stopping the person. *Branham*, 283 Va. at 280 (quoting *I.N.S. v. Delgado*, 466 U.S. 210, 217 (1984)). "In order to determine what cause is sufficient to authorize police to stop a person, cognizance must be taken of the 'totality of the circumstances – the whole picture.'" *Leeth v. Commonwealth*, 223 Va. 335, 340 (1982) (quoting *United States v. Cortez*, 449 U.S. 411, 417 (1981)). Furthermore, an assessment of the totality of the circumstances "allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" *Branham*, 283 Va. at 280 (quoting *United States v. Arvizu*, 534 U.S. 266, 273 (2002)); *Freeman v. Commonwealth*, 20 Va. App. 658, 661 (1995) ("[A] trained law enforcement officer may [be

---

[2] In addition, because Feagins was asked for an "ID," not for his *driver's license*, this Court's decision in *Brown v. Commonwealth*, 17 Va. App. 694 (1994), does not control the result here even though Feagins handed the officer an ID that happened to be his driver's license. *See id.* at 697 (holding that a defendant is seized if an officer asks for his *driver's license* after the defendant has recently been operating a vehicle (citing Code § 46.2-104 (requiring vehicle operator on officer's request to exhibit license))); *see McCain*, 261 Va. at 490.

able to] identify criminal behavior which would appear innocent to an untrained observer." (alterations in original) (quoting *Taylor v. Commonwealth*, 6 Va. App. 384, 388 (1988))).

In addition, although a single act may be "'innocent in itself,'" a series of otherwise innocent acts collectively may be "suspicious enough that a reasonable officer [will have] grounds to stop [a suspect] for purposes of investigating the situation further." *Raab v. Commonwealth*, 50 Va. App. 577, 581 (2007) (en banc) (quoting *Arvizu*, 534 U.S. at 274). The Supreme Court has stated, "The reasonable-suspicion standard is not an exacting one, and the mere possibility of an innocent explanation does not necessarily exclude a reasonable suspicion that criminal activity is afoot." *Hill v. Commonwealth*, 297 Va. 804, 815 (2019) (internal quotations and citations omitted); *see Arvizu*, 534 U.S. at 274. This Court has previously held that reasonable, articulable suspicion was not present in cases where a suspect merely made a furtive gesture while in an area that is known for criminal activity. *See Riley v. Commonwealth*, 13 Va. App. 494 (1992); *Smith v. Commonwealth*, 12 Va. App. 1100 (1991); *see also Goodwin v. Commonwealth*, 11 Va. App. 363 (1990). However, in a high-crime area, the combination of a furtive gesture with other indicia of criminal activity can certainly justify a brief investigatory detention. *See Beasley*, 60 Va. App. at 397 ("[W]hat those cases [*Riley*, *Smith*, and *Goodwin*] have in common is that they involve one or some, *but not all,* of the *many* circumstances supporting reasonable, articulable suspicion that are present here. Accordingly, those cases do not control the analysis here." (emphases in original)).

As stated by the Supreme Court of the United States in *Arvizu*, courts must look at the "totality of the circumstances of each case to see whether the detaining officer has a particularized and objective basis for suspecting legal wrongdoing," and this standard is a relatively low bar as the likelihood of that wrongdoing "need not rise to the level required for

- 11 -

probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard." *See Arvizu*, 534 U.S. at 273-74 (internal quotations omitted).

The record before us on appeal provides ample support for the trial court's findings and its conclusion that the officers possessed reasonable, articulable suspicion to detain Feagins. Here, Sergeant Vito and Officer Muhich were in a high-crime neighborhood at approximately 6:30 p.m. on a winter evening as it was almost dark. The officers saw that Feagins's vehicle was backed into a parking space in a parking lot with his vehicle still running in an area known for car thefts and other criminal activity. However, most importantly, two more pertinent facts cannot be avoided: (1) the suspicious knotted plastic baggie on Feagins's dashboard, and (2) Feagins's furtive movement to conceal that suspicious object from the officers' view.

Here, the police were suspicious of the plastic baggie even before Feagins concealed it in his clenched fist. The body-worn camera footage from both officers shows that Sergeant Vito was fixated on the spot where the plastic baggie was located and that he repeatedly illuminated the bag with his flashlight. He testified that, from where he was standing, he could see "a plastic bag that was bunched up or knotted up." At the time of the incident, Sergeant Vito had been a police officer for more than 12 years, and he had worked in a narcotics unit for 4 years. Sergeant Vito testified that, based on his training and experience, the knotted or bunched-up plastic bag that he saw was one commonly used to package narcotics. The body-worn camera footage shows that Sergeant Vito immediately responded after Feagins reached for the plastic baggie. Later, Sergeant Vito even asked, while the bag was still concealed in Feagins's fist, whether the bag contained cocaine powder. Consequently, the trial court was not plainly wrong to find (1) that Sergeant Vito observed the knotted or bunched-up baggie while it was in plain view, (2) that the police reasonably believed that the clear plastic baggie contained narcotics, and

(3) that it was, therefore, clearly suspicious – i.e., showing a reasonable suspicion that criminal activity was afoot.

Under the totality of the circumstances analysis required by the United States Supreme Court, we must view these facts in connection with Feagins's furtive attempt to conceal this suspicious item. *See Arvizu*, 534 U.S. at 273-74 (holding that courts must take into account the "totality of the circumstances" and that the factors leading to a finding of reasonable, articulable suspicion must not be viewed in "isolation from each other"); *Sibron v. New York*, 392 U.S. 40, 66-67 (1968) (finding that furtive actions upon the approach of law officers are proper factors to consider when determining whether a person is engaging in criminal activity). Here, Feagins intentionally tried to hide the knotted plastic baggie when Sergeant Vito was not looking. Sergeant Vito testified that Feagins "waited until I was out of sight of the driver's side or the passenger's side window in order to reach up and get it." Feagins then furtively reached up and grabbed the baggie, and he then kept it in his closed fist with his palm and knuckles facing down towards the floor as he attempted to keep the baggie's contents hidden from the two officers.

As stated by this Court and by the Supreme Court of Virginia, the furtive movement of a suspect to conceal a suspicious object can by itself provide officers with probable cause to effect an arrest. *See Copeland v. Commonwealth*, 42 Va. App. 424, 434 (2004) (reasoning that "if police see a person in possession of a highly suspicious object or some object which is not identifiable but which because of other circumstances is reasonably suspected to be contraband, *and then* observe that person make an apparent attempt to conceal that object . . . , probable cause is then present" (quoting 2 Wayne R. LaFave, *Search and Seizure* § 3.6(d), at 319 (3d ed. 1996))); *Brown v. Commonwealth*, 270 Va. 414, 420-21 (2005) (holding that observation of material which can be used for legitimate purposes can support a finding of probable cause if combined with some other circumstance indicating criminal activity "such as attempted

concealment of the item" (quoting *Thomas v. Superior Court*, 22 Cal. App. 3d 972 (1972))); *Hollis v. Commonwealth*, 216 Va. 874, 877 (1976) ("The appearance of the cigarette and Hollis's furtive gesture in attempting to hide it combined to provide the necessary probable cause to search the car without obtaining a warrant" where police first received an anonymous tip.); *Mavin v. Commonwealth*, 31 Va. App. 161, 164-66 (1999) (finding probable cause to enter a vehicle and seize a prescription bottle where an officer "recognized the prescription bottle as a type frequently used to carry crack cocaine," saw it in plain view and that it bore no label, and observed a passenger try to hide it).

As stated *supra*, showing probable cause is a higher burden than showing reasonable suspicion. *See Arvizu*, 534 U.S. at 273-74. Consequently, given that a suspect's possession of a suspicious object combined with his furtive movement to conceal it from police is sufficient to establish probable cause, then it is certainly sufficient to establish reasonable, articulable suspicion. *See Walker v. Commonwealth*, 42 Va. App. 782, 791 (2004) (holding that police had reasonable suspicion when the suspect "was standing, at night, in an area known for drug activity," and upon the arrival of police "attempted to shove his closed hand into the back pocket of the person beside him" and then back into his own pocket, while breathing heavily). In short, Feagins's suspicious gesture of reaching for and concealing an object – an object which itself was suggestive of criminal activity – when reviewed in the totality of the other circumstances here, provided the officers reasonable, articulable suspicion to detain Feagins and further investigate whether he was engaging in criminal conduct. *See Beasley*, 60 Va. App. at 397; *Mavin*, 31 Va. App. at 164-66. Consequently, we hold that the officers here possessed reasonable, articulable suspicion to briefly detain Feagins to investigate whether criminal activity was afoot. *See Hill*, 297 Va. at 815 ("The reasonable-suspicion standard is not an exacting one." (internal quotation omitted)).

III. CONCLUSION

In short, the trial court did not err in denying Feagins's motion to suppress the evidence seized as a result of Feagins's encounter with law enforcement officers. It was not error for the trial court to determine that the initial encounter between Feagins and the officers was consensual because Feagins's ability to drive away from the parking lot (or simply to roll up his window and stay where he was) was not prevented until he was detained when reasonable, articulable suspicion had developed that "criminal activity may be afoot." *See Terry*, 392 U.S. at 30. In *McCain v. Commonwealth*, under similar circumstances and even when the officer made significantly more demanding requests than those at issue here, the Supreme Court determined that the encounter was consensual. 261 Va. 483. Consequently, the trial court did not err in deciding that the initial encounter now before us was consensual.

Furthermore, once Feagins was seized by the officers shortly after he grabbed the knotted plastic baggie and concealed it in his closed fist, it was not error to admit evidence arising from the encounter after Feagins grabbed the baggie because, at that moment, the officers then had reasonable, articulable suspicion to detain Feagins. A review of the totality of the circumstances here shows that Feagins was parked in a high-crime area in the evening when it was almost dark, in a running vehicle, and in a location known for car thefts. Most importantly, while conversing with the police officers, Feagins reached for a knotted plastic baggie (that Sergeant Vito had already seen and identified, based on his training and 12 years of experience, as being the kind of baggie used for narcotics) and quickly concealed the baggie in his closed fist. Considering the totality of these circumstances, the law enforcement officers certainly were justified to conduct a brief investigation under *Terry* of Feagins. *Bass*, 259 Va. at 474-75 (citing *Terry*, 392 U.S. at 30).

For all of these reasons, we hold that the trial court did not err in denying the motion to suppress, and we therefore do not disturb Feagins's convictions and the judgment of the trial court.

*Affirmed.*

Chaney, J., dissenting.

To determine whether Feagins was seized for purposes of the Fourth Amendment when he handed over his identification to police, this Court "must consider all the circumstances surrounding the encounter to determine whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter." *Florida v. Bostick*, 501 U.S. 429, 439 (1991). Considering the totality of the circumstances related to the officer's request for Feagins's identification, I conclude that the police subjected Feagins to an investigative detention—and unconstitutional seizure—without reasonable articulable suspicion that he was engaged in any criminal activity. Thus, I disagree with the trial court's judgment—affirmed by the panel's majority—that Feagins's encounter with police was consensual when he handed over his driver's license. Accordingly, I respectfully dissent from the majority's opinion affirming the trial court's denial of Feagins's motion to suppress the evidence arising from the unconstitutional seizure.

The circumstances surrounding Feagins's encounter with the police included the following: Before approaching Feagins's car and requesting his identification, the police activated their marked police vehicle's "take-down lights" and parked the police vehicle "adjacent and perpendicular to" Feagins's parked car. Then an armed, uniformed officer exited the police vehicle and approached the driver's side of Feagins's car with a flashlight shining into the car. At the same time, a second armed, uniformed officer exited the police vehicle and approached the passenger side of Feagins's car. As one officer questioned Feagins on the driver's side, the other officer stood on the passenger side inspecting the interior of Feagins's car with a flashlight. The officer who initially questioned Feagins requested his identification and told him that the police were "check[ing] the parking lot" and "IDing people" in response to "a problem of stolen vehicles." Considering the totality of the circumstances, a reasonable person in Feagins's position would not have considered himself free to

leave and disregard the officer's request for identification. Therefore, Feagins was seized for purposes of the Fourth Amendment's protection against unreasonable police seizures when he complied with the officer's request. *See United States v. Mendenhall*, 446 U.S. 544, 553 (1980) ("[A] person is 'seized' only when, *by means of physical* force *or a show of authority*, his freedom of movement is restrained." (emphases added)); *see also Dickerson v. Commonwealth*, 266 Va. 14, 17 (2003) ("So long as a reasonable person would feel free 'to disregard the police and go about his business,' the encounter is consensual and there is no violation of the Fourth Amendment." (quoting *Bostick*, 501 U.S. at 434)).

The police seizure of Feagins was unconstitutional because the police had no reasonable articulable suspicion of any criminal activity by Feagins when the police requested and obtained his identification. *See Bass v. Commonwealth*, 259 Va. 470, 474-75 (2000) ("A police officer may constitutionally conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot."); *see also Long v. Commonwealth*, 72 Va. App. 700, 712 (2021) ("A reasonable, articulable suspicion is 'a particularized and objective basis for suspecting the person stopped of criminal activity.'" (quoting *Ornelas v. United States*, 517 U.S. 690, 696 (1996))).

During the unconstitutional seizure of Feagins, the police found and seized the incriminating drug and firearm evidence. Thus, the drug and firearm evidence should have been suppressed as fruits of the unconstitutional seizure. S*ee Terry v. Ohio*, 392 U.S. 1, 15 (1968) (holding that an unreasonable search or seizure by police "must be condemned by the judiciary and its fruits must be excluded from evidence in criminal trials"); *see also Wong Sun v. United States*, 371 U.S. 471, 487-88 (1963). Therefore, I would hold that the trial court erred in denying Feagins's motion to suppress the evidence arising from the unconstitutional seizure.

The majority contends that its holding is compelled by the Virginia Supreme Court's opinion in *McCain v. Commonwealth*, 261 Va. 483 (2001), but the circumstances surrounding the police encounter in *McCain* are distinguishable from the circumstances surrounding Feagins's police encounter. In *McCain*, the Supreme Court held that no seizure occurred when a police officer parked behind the defendant's car in a parking lot, illuminated the defendant's parked car with the police vehicle's headlights and spotlight, approached the defendant's car on foot, shined his flashlight into the back seat of the defendant's car, asked the defendant "what was going on," requested the defendant's and his passenger's identifications, and retained the defendant's identification while checking for outstanding warrants. *Id.* at 486-90. The majority's reliance on *McCain* is misplaced. In *McCain*, a single officer approached and initiated a conversation with the defendant; whereas here, while one officer questioned Feagins on the driver's side of his car, a second officer positioned himself on the passenger side and inspected the car's interior using a flashlight. Given such an intimidating display of police authority, a reasonable person in Feagins's position would not consider himself free to leave and terminate the police encounter.

However, even if Feagins's police encounter is deemed consensual at the outset when both officers approached his car, the police encounter became a seizure when Feagins complied with the officer's request for his identification. The trial court correctly cited *McCain* for the proposition that "a police request made in a public place for a person to produce some identification, *by itself*, generally does not constitute a Fourth Amendment seizure." *Id.* at 491 (emphasis added). However, in this case, the officer did not merely request Feagins's identification. In contrast with the officer's non-accusatory request for the defendant's identification in *McCain*, the officer who requested Feagins's identification linked the request to the police investigation of vehicle thefts from the parking lot. Additionally, the officer's request for Feagins's identification was made in conjunction with the second officer's intimidating,

invasive behavior. Thus, the purportedly consensual encounter was converted into an investigative detention. *See Bostick*, 501 U.S. at 434-35 (recognizing that a police-citizen encounter is non-consensual where the conduct of police "convey[s] a message that compliance with their requests is required"). Given the totality of the circumstances, a reasonable person in Feagins's position would not have considered himself free to leave and refuse the officer's request for identification.

For the foregoing reasons, I would reverse the trial court's judgment denying Feagins's motion to suppress, vacate Feagins's convictions, and remand to the trial court to allow Feagins to withdraw his guilty pleas pursuant to Code § 19.2-254.